# RICHARD DANNY TICHNELL *v.* STATE OF MARYLAND

[No. 60, September Term, 1980.]

*Decided April 6, 1981.*

44

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Clark B. Frame,* with whom was *G. Gary Hanna* on the brief, for appellant.

*Deborah K. Handel, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. DAVIDSON, J., concurs in the result.

This case involves Maryland's capital punishment statute, Maryland Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Art. 27, §§ 412-414, and whether the death sentence imposed by a jury upon Richard Tichnell comported with statutory and constitutional requirements.

(1)

On January 18, 1979, at approximately 5:25 a.m., Tichnell and a confederate, Oscar Recek, broke into a store near Oakland, Maryland and stole ten handguns. Within minutes after leaving the store, Tichnell was accosted by Deputy Sheriff David Livengood, who had been dispatched to the scene in response to a silent alarm activated by the storehouse breaking. In the course of their encounter, Tichnell shot and killed the deputy. Thereafter, Recek and Tichnell took Deputy Livengood's police cruiser and fled the scene. They were apprehended later that morning in West Virginia. At that time, Tichnell admitted to the police that he had shot Deputy Livengood, but claimed the shooting was in justifiable self-defense. In his statement, Tichnell told the

police that he had submitted to arrest by Livengood and was directed to lie on the ground under guard by the deputy's K-9 dog. Tichnell said that when he moved his head, the dog bit him in the eye, after which he ran to his nearby car to get his medical kit to bandage his eye. According to Tichnell's statement, Livengood followed him and without provocation shot him in the shoulder, propelling him backwards through the open front door of his car. As Livengood prepared to fire at him again, Tichnell said he retrieved his own gun, which was under the front seat of his car, and after the deputy had fired at him a second time, Tichnell shot the deputy four or five times at close range.

Tichnell was indicted on March 2, 1979 for first degree murder. Pursuant to Code, Art. 27, § 412 (b), the State notified Tichnell that it sought imposition of the death penalty.

At Tichnell's jury trial, the State presented a number of witnesses to establish that he had murdered the deputy in cold blood as he was interrupted in his departure from the scene of the storehouse breaking. Tichnell's testimony in his own behalf was consistent with the statement which he had given to the police at the time of his arrest. The only eyewitness to the shooting, Oscar Recek, was also indicted for the offense and did not testify. The jury rejected Tichnell's version of the killing and found him guilty of wilful, deliberate and premeditated first degree murder.

Tichnell elected to be sentenced by the trial judge, rather than by the jury, as authorized by § 413 (b) (3). The judge imposed the death penalty. On appeal, we affirmed the judgment of conviction but vacated the death sentence on the ground that it had been imposed under the influence of an "arbitrary factor" in violation of § 414 (e) (1). *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980). As required by the provisions of § 414 (f) (1) (ii), we remanded the case "for a new sentencing proceeding under § 413." *Id.* at 745.

On remand, Tichnell elected to be resentenced by a new jury, as authorized by § 413 (b) (2) (iv). It was the sole function of the jury to determine whether Tichnell should be

sentenced to death or life imprisonment. § 413 (a). In making that determination, the jury was governed by various subsections of § 413. The "type of evidence" admissible at the sentencing hearing is delineated in § 413 (c):

"(i) Evidence relating to any mitigating circumstance listed in subsection (g);

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of which the State had notified the defendant pursuant to § 412(b);

(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

Under § 413 (d), it is the province of the sentencing jury to determine from the evidence whether any of the aggravating circumstances enumerated in that section, and relied upon by the State for the imposition of the death penalty, have been established beyond a reasonable doubt.[1] Under § 413

---

1. Section 413 (d) sets forth ten aggravating circumstances, *i.e.*:

"(1) The victim was a law enforcement officer who was murdered while in the performance of his duties.

(2) The defendant committed the murder at a time when he was confined in any correctional institution.

(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer.

(4) The victim was a hostage taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct.

(5) The victim was a child abducted in violation of § 2 of this article.

(g), the jury is required to determine, by a preponderance of the evidence, whether any of eight enumerated mitigating circumstances exist.[2] Should the jury not find, beyond a reasonable doubt, the existence of one or more aggravating circumstances, it is required to impose a life sentence. § 413 (f). Should the jury find the existence of both aggravating and mitigating circumstances, it then must determine, by a preponderance of the evidence, whether "the mitigating circumstances outweigh the aggravating circumstances." § 413 (h) (1). If the jury finds "that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death." § 413 (h) (2). If the jury finds "that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life." § 413 (h) (3).

---

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder.

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life.

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident.

(10) The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree."

**2.** Section 413 (g) sets forth the following mitigating circumstances:

"(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence. As used in this paragraph, 'crime of violence' means abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.

(2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.

(3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.

(2)

At the outset of Tichnell's resentencing hearing, the trial judge stated that he intended to adhere to his decision, made earlier at a conference with counsel present, to have the transcript of Tichnell's trial read to the jury. He said that "short of having a full-blown trial, there was no other way to proceed." The trial judge said that Tichnell could object to the reading of any part of the trial transcript and he would rule on the objection at that time. Tichnell entered a "vociferous objection" to reading the transcript of the trial proceedings to the jury. He argued that § 413 (c) explicitly sets forth the "type of evidence" that could be admitted at the sentencing hearing, and did not include the introduction of the prior recorded trial testimony, as contained in the trial transcript. He said that the transcript would reveal, to his grievous prejudice, the commission of other criminal offenses for which he was neither charged nor convicted. He argued that the jury "is going to necessarily pass on the credibility of the witnesses with reference to whether or not aggravating circumstances and/or mitigating circumstances exist." He maintained that the federal constitution safeguards his right to have the sentencing jury "see the witnesses [and] . . . for us to adduce any additional cross-examination, which could be entirely different now than it was." The court overruled Tichnell's objection, stating that he could "rebut any testimony under the rules and under the law."

---

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication.

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case."

After the jury was sworn, the trial judge advised it that Tichnell's guilt of first degree murder had been previously established and the jury was "merely . . . to determine the sentence"; that the transcript of Tichnell's criminal trial would be read to the jury; that the State could "expand upon that, if they have any further evidence of any probative value, and the defense, of course, may rebut and put any mitigating circumstances on which they think are probative, after which you will hear argument of counsel."

Opening statements of counsel were then made to the jury. The prosecutor outlined his version of the evidence that would be established from a reading of the trial transcript. He told the jury that he would prove the existence of two aggravating circumstances under § 413 (d), namely, that Livengood was a law enforcement officer killed in the performance of his duties, and that the murder was committed in furtherance of an escape or an attempt to escape from or evade lawful arrest by a law enforcement officer. In his opening statement, Tichnell's counsel outlined his version of the evidence adduced at the trial. He conceded that Livengood was a law enforcement officer killed in the performance of his duties, but denied that the evidence would establish that the killing took place during an escape or an attempt to evade Livengood's lawful custody. Tichnell told the jury that the evidence would establish these mitigating circumstances: that he had no prior criminal record; that the victim was a participant in his (Tichnell's) conduct; that he acted under substantial duress or provocation; that he was of a youthful age; that his act in killing the deputy was not the sole proximate cause of the deputy's death; and that since he (Tichnell) would be in prison for life, he would not be a continuing threat to society.

After opening statements were completed, the trial transcript was introduced into evidence over Tichnell's objection and two court reporters undertook to read the questions and answers of the witnesses at the trial to the sentencing jury. The testimony of seven State witnesses was read to the jury with few objections being made by Tichnell. The testimony of another State witness implicating Tichnell in the commis-

sion of other crimes was objected to and was not read to the jury. A dispute then arose as to the "ground rules," each counsel stating a different view of what was to be done when they could not agree on the relevancy of the prior recorded testimony of the witnesses. At the court's urging, counsel agreed to consider stipulating as to the relevancy of the testimony of the remaining witnesses who testified for the State at the trial. At this point, the prosecutor moved for permission to produce live witnesses to complete the presentation of his case to the sentencing jury; the trial judge denied the request. At the same time, the court said that it was not limiting anyone in the presentation of relevant testimony. The court noted that the procedure of reading the transcript to the jury was subject to Tichnell's objection and this was so even though he agreed to stipulate to certain evidence being read to the jury from the transcript. The prosecutor objected to the procedure being followed by the court, stating that it was his understanding that the entire transcript and all the trial exhibits would be presented to the jury. At this juncture, the court said:

> "I am attempting to let this jury have some of the facts, enough so they can determine, one, that the deceased was a police officer in the performance of his duties; two, that there was an escape or attempt to escape from lawful custody, which are the elements you have alleged entitled the State of Maryland to request the death penalty. Anything other than that, I don't consider relevant."

The court said that the entire transcript would not be read to the jury but only those parts which were relevant. It told Tichnell that he could offer the testimony of any live witnesses that he might wish to call and that the State also could offer additional testimony, other than of witnesses whose testimony was included in the trial transcript. This exchange resulted in Tichnell's counsel claiming that he was being "whipsawed, with the State trying to change the rules in the middle of the stream." The court then remarked: "We are going to proceed as we started out. You may proffer any witnesses you wish."

Both the prosecutor and Tichnell's counsel expressed continuing dissatisfaction with the procedure being followed. The trial judge again remarked that no other procedure could be utilized. Thereafter, counsel agreed to stipulate to the relevancy of the testimony of the remaining State witnesses who had testified at the trial, as well as to the admissibility of certain photographic and other trial exhibits.

After the State concluded its case-in-chief, Tichnell testified before the sentencing jury. His testimony was consistent with his testimony at the trial, the thrust of which conformed with his statement given to the police at the time of his arrest, *i.e.,* that after the storehouse breaking he was apprehended by the deputy and submitted to arrest; that he was not attempting to escape or evade lawful custody when, after he was bitten by the officer's K-9 dog, he went to his car to bandage his eye; that the officer followed him there and shot him through the shoulder without provocation; and that it was only to save his own life that he shot and killed the deputy sheriff. In his testimony, Tichnell undertook to produce evidence of mitigating circumstances, as enumerated in § 413 (g). Tichnell's wife and mother testified in his behalf.

The court permitted the prosecutor to call one live rebuttal witness to testify — a forensic chemist who sought to rebut Tichnell's testimony that the shooting was at point-blank range. It was the chemist's testimony that because there were no powder burns on the shoulder portion of Tichnell's jacket, the shooting could not have occurred consistent with Tichnell's version of the event.

The trial judge then instructed the sentencing jury. He said that because the jury had not heard the evidence in the original case, counsel and the court had attempted to give the jury "at least the basic facts as they were presented to that previous jury." He reminded the jury that it "did not see or hear, save for a few, the actual witnesses or the testimony as it was originally presented." Having parts of the trial transcript read to the jury was, the trial judge said, "the only

way the Court could see to produce the actual testimony as it was given." The court continued:

> "Obviously, with human frailties, had we brought the witnesses back there may be some variance in the testimony. But we felt that you were entitled to hear, even though you didn't hear it from the actual mouths of the witnesses, the testimony as it was produced at the previous trial."

The court fully instructed the jury, consistent with the language of § 413 as to the burden of proving the existence of aggravating and mitigating circumstances, as well as the consequences of the jury's determination. Following extended closing arguments of counsel, the jury found the existence of the two aggravating circumstances relied upon by the State: (1) that the victim was a law enforcement officer who was murdered in the performance of his duties, and (2) that the defendant committed the murder in furtherance of an escape from or an attempt to escape from or evade lawful custody by a law enforcement officer. The jury found three mitigating circumstances to exist: (1) that the defendant had not previously been convicted of a crime of violence, (2) that the defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution, and (3) that it is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society. The jury found that it was not proven by a preponderance of the evidence that the mitigating circumstances outweighed the aggravating circumstances and accordingly, pursuant to § 413 (h) (2), the jury sentenced Tichnell to death.

(3)

Tichnell contends on appeal that the action of the trial court in admitting the transcript of the criminal trial over his objection violated § 413 (c), which limits the "type of evidence" admissible at a capital sentencing hearing. Addi-

tionally, he claims that the admission of the transcript at the sentencing hearing denied him the right of confrontation and cross-examination in violation of the Sixth Amendment to the federal constitution.[3] He also argues that the sentencing proceeding was a critical stage of the trial proceedings at which due process and fair trial principles apply. The key issue at the sentencing hearing, it is argued, concerned whether there was proof beyond a reasonable doubt that Tichnell was escaping or attempting to escape from or evade lawful custody when the deputy was shot and killed. Tichnell urges that the use of prior recorded trial testimony as a means to prove this statutory aggravating circumstance offended his confrontation and due process rights because it was not shown that the witnesses were unavailable to testify at the sentencing hearing. Moreover, Tichnell suggests that the trial judge was erroneous in his belief, as expressed in his instructions to the jury, that it was the court's responsibility to produce before the jury "the actual testimony as it was given" at the trial.

The State contends that it was within the discretion of the trial judge to restrict the prosecution to the presentation of evidence through reading of portions of the earlier transcribed testimony. While the State agrees that Tichnell was entitled to due process at his capital sentencing hearing, and that it would have been preferable had the prosecutor been permitted to present live testimony from all who testified at the original trial, nevertheless it maintains that Tichnell was not denied any statutory or constitutional rights by the procedure utilized by the trial judge.

According to the State, § 413 contemplates that the capital sentencing proceeding will ordinarily be conducted before the same jury that determined the defendant's guilt, and would therefore have before it all the evidence presented in the case. In such circumstances, the purpose of the separate sentencing hearing would be to provide an opportunity to present additional evidence as to the existence of

---

**3.** "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

54

aggravating and/or mitigating circumstances. But where, as here, the sentencing tribunal has not heard the evidence proving the commission of the murder, the State points to the need for some mechanism for providing information about the crime itself. In the present case, the State contends that it was the purpose of reading the transcript of the prior trial to acquaint the jury with the circumstances of the offense so that, with whatever additional evidence was available, the jury could properly determine whether the sentence would be death or life imprisonment.

The State argues that the prior recorded trial testimony read to the jury had been given under oath, with Tichnell present to confront and cross-examine the witnesses against him. Most of the witnesses who testified for the State, it is suggested, described objective observations about which there was little dispute. It is therefore argued that this is not a case, like *Gardner v. Florida,* 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), upon which Tichnell places reliance, where a death sentence was vacated because it was based in part on information contained in a presentence report not revealed to the defendant or his counsel, and which the defendant had no opportunity to deny or rebut. Tichnell's right of confrontation was satisfied, the State urges, despite the fact that the prior recorded testimony was used at the sentencing hearing, because he was present at the sentencing hearing and had ample opportunity to refute or explain the evidence as it was there presented. The State argues that under *Ohio v. Roberts,* 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), a showing of unavailability of the witnesses is not required where confrontation would serve no useful purpose. Because confrontation of live witnesses at the sentencing hearing would not have served a useful purpose in this case, the State concludes that the reading of the prior testimony of Tichnell's criminal trial fully satisfied his due process rights.

(4)

We said in *Crawford v. State,* 282 Md. 210, 383 A.2d 1097 (1978), with full citation to controlling Supreme Court deci-

sions, and to our own cases, that the Sixth Amendment right of an accused in a criminal case to confront the witnesses against him is a fundamental constitutional right made obligatory on the states by the Fourteenth Amendment to the federal constitution.[4] We said, citing *State v. Collins,* 265 Md. 70, 288 A.2d 163 (1972), that the same right is secured by Article 21 of the Maryland Declaration of Rights. We noted that the primary interest secured by the confrontation clause is the right of cross-examination and that an adequate opportunity for cross-examination at the earlier proceeding may satisfy the clause in the absence of physical confrontation at the later proceeding. However, for the testimony taken in the former proceeding to be admissible at a subsequent proceeding, we said that both the state and federal constitutions, as well as Maryland common law, ordinarily require proof that the witness whose prior testimony is to be used is unavailable to testify.

It is well recognized that the right to confront and cross-examine the witnesses against the accused insures the accuracy of the fact-finding process by testing the witnesses' credibility. *Davis v. Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *California v. Green,* 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); *Barber v. Page,* 390 U.S. 719, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968). *Ohio v. Roberts, supra,* upon which the State places reliance — we think erroneously — involved the use of the prior recorded preliminary hearing testimony of a witness at the subsequent criminal trial. The accused objected on the ground that such use violated the confrontation clause of the Sixth Amendment. The Supreme Court there said, referring to or quoting from earlier of its decisions, that the clause reflects a preference for face-to-face confrontation at trial; that the primary interest secured by the clause is the right of cross-examination; that it is the literal right to "confront" the witness at trial that forms the core of the values furthered by the confrontation clause; and that the clause envisions a

---

4. *See* Dutton v. Evans, 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970); Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that the jurors may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. The Court said that these means of testing the accuracy of the witness' testimony are so important that the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process. The Court pointed out that, by necessity, former recorded testimony was admissible at a subsequent trial as long as cross-examination was permitted at the earlier hearing, and it was shown that the witness whose prior testimony was introduced was not available to testify at the later proceeding. The Court said that the confrontation clause "normally requires a showing that [the witness] is unavailable" and, even then, his testimony is admissible only if it bears adequate " 'indicia of reliability.' " 100 S. Ct. at 2539.

Whether these principles apply to the use of prior recorded trial testimony at a sentencing hearing under Maryland's capital sentencing statute is the nub of the issue before us. In this connection, it is undisputed that the prosecution witnesses who testified at Tichnell's trial were available to testify at the sentencing hearing.

The Supreme Court has considered the application of the confrontation and due process clauses to criminal sentencing hearings in a number of cases. *Williams v. New York,* 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), involved a first degree murder conviction by a jury which recommended a sentence of life imprisonment. After receiving a presentence report and conducting a separate sentencing hearing, the trial judge imposed the death sentence. Although the petitioner did not challenge the accuracy of the judge's findings or seek an opportunity to rebut them, he contended on appeal that he had been denied due process because he was unable to cross-examine the authors of the

presentence report. The Supreme Court discussed the need for the sentencing judge to possess the "fullest information possible concerning the defendant's life and characteristics" so that the sentence would fit the offender and not just the crime and contrasted this purpose with the protective purposes of the rules of evidence in criminal trials. *Id.* at 247. After concluding that much of the information contained in the presentence report would be unavailable to the sentencing authority if it was restricted to information produced in open court by testifying witnesses subject to cross-examination, the Court said:

> "[W]e do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts — state and federal — from making progressive efforts to improve the administration of criminal justice." *Id.* at 251.

In *Williams v. Oklahoma,* 358 U.S. 576, 79 S. Ct. 421, 3 L. Ed. 2d 516 (1959), the petitioner pled guilty to kidnapping and did not request a separate, formal sentencing hearing. He was sentenced to death after the prosecutor read a statement of facts to the court concerning the various crimes committed by the petitioner and his past criminal record. Citing *Williams v. New York, supra,* the Supreme Court held that the reading of the statement of facts did not deprive the petitioner of his constitutional right of confrontation and cross-examination as it was permissible and consistent with the requirements of due process for the sentencing judge to use information gathered outside the courtroom to determine a proper sentence. *Id.* at 584.

In *Specht v. Patterson,* 386 U.S. 605, 87 S. Ct. 1209, 18 L. Ed. 2d 326 (1967), the petitioner was convicted of a sexual offense and on the same day, without notice or a hearing, was also sentenced to an indeterminate period under the

Colorado Sex Offenders Act. The petitioner contended that he was denied due process because his right to confront and cross-examine adverse witnesses had been denied. Although the Supreme Court stated its continued adherence to *Williams v. New York, supra,* it declined to extend the principles of that case to "this radically different situation" because after the petitioner received his initial conviction, he was also sentenced under another proceeding which involved a new finding of fact. *Id.* at 608. In these circumstances, the Court held that due process required that the petitioner have an opportunity to confront and cross-examine the witnesses against him.

In *Gardner v. Florida,* 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977), the petitioner was convicted of first degree murder and was sentenced to death after a separate sentencing hearing. He contended that he had been denied due process because neither he nor his attorney was given access to part of the presentence report. The Supreme Court, in a plurality opinion, stated that the holding of *Williams v. New York* was not applicable because in that case the sentencing judge related the material facts on the record and the petitioner failed to challenge them, and because the Court now recognized the uniqueness of the death penalty as punishment, *id.* at 356-57. It held that because the sentencing process must also satisfy the requirements of the due process clause, the petitioner's right to that constitutional guarantee was denied when his death sentence was based in part upon information which he had no opportunity to rebut.

Although *Gardner* required that sentencing hearings conform to due process standards, the Court noted that "[t]he fact that due process applies does not, of course, implicate the entire panoply of criminal trial procedural rights." *Id.* at 358. The case indicates that if a presentence report is fully disclosed and opportunity is given the defendant to explain or rebut it, its use during a capital sentencing proceeding would not constitute an abuse of due process. Thus, it appears that *Gardner* did not overrule the holding in *Williams* that the constitutional right of confrontation does

not proscribe the use of presentence reports in capital sentencing proceedings.

Nothing in *Williams* or its progeny governs whether, in the circumstances of the present case, Tichnell was denied his right of confrontation or due process by reason of the introduction of the prior recorded trial testimony. As already indicated, the Maryland capital sentencing statute requires a bifurcated proceeding: (1) the trial to determine the accused's guilt of the offense charged and (2) a separate sentencing hearing, if the accused is found guilty, to determine whether the penalty should be life imprisonment or death. The sentencing phase of the proceeding involves (1) a determination by the sentencing authority of whether the aggravating circumstances relied upon by the State to justify imposition of the death sentence have been established by the evidence beyond a reasonable doubt and (2) a determination of whether mitigating circumstances upon which the defendant has placed reliance have been established by a preponderance of the evidence. Thus, the issue for determination is different in each proceeding, although manifestly a by-product of the evidence adduced at the trial will reveal, to some extent at least, the existence or absence of aggravating and/or mitigating circumstances. The ultimate issue to be decided by the sentencing authority, where both aggravating and mitigating circumstances are shown to exist, is whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances; if they do not, the death penalty must be imposed.

The "type of evidence" adducible at the sentencing hearing, as outlined in § 413 (c), includes, in addition to evidence pertaining to mitigating and aggravating circumstances, and the presentence report, "other evidence" deemed by the court to be "of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

In the usual case in which the prosecutor seeks the death penalty and obtains a qualifying first degree murder conviction, the trial judge and jury which heard the evidence at

trial will also be involved in the subsequent sentencing proceeding; therefore, they will be full conversant with the evidence introduced prior to the commencement of the sentencing hearing. However, where an accused elects a court trial, but after conviction elects to be sentenced by a jury, as authorized by § 413 (b) (2) (ii), the sentencing jury will have no prior knowledge of the evidence produced at the trial. The same situation prevails where, as here, the original death sentence was vacated on appeal and a new jury is impaneled to hear the evidence at the sentencing phase of the proceeding.

The trial judge apparently believed that it was essential that the transcript of the prior trial testimony be introduced in evidence so that the sentencing jury would have before it the identical testimony that was produced before the fact finder at the guilt stage of the proceeding. He thus declined in the first instance to permit the State to discharge its burden of proving the existence of aggravating circumstances through the testimony of the same witnesses who testified at the trial even though, as the State candidly admitted at oral argument before us, it wanted to produce live witnesses at the sentencing hearing to enhance its chances of convincing the jury beyond a reasonable doubt that aggravating circumstances existed which were of such gravity as would justify imposition of the death penalty. The trial judge later indicated that the State could "expand" on the prior recorded testimony previously introduced in evidence before the sentencing jury; that Tichnell could object on relevancy grounds to any of the State's evidence as introduced through a reading of the trial transcript, or could otherwise rebut it; and that Tichnell could also produce evidence to show the existence of mitigating circumstances. Tichnell's objection to the procedure mandated by the trial judge was based, in part, upon his argument that the evidence pertaining to the existence of aggravating and/or mitigating circumstances involved witness credibility and demeanor and therefore the jury had to consider live testimony, subject to cross-examination, rather than the sterile reading of the trial transcript.

To persuade the jury to impose a life rather than a death sentence, Tichnell wanted to convince it that the mitigating circumstances outweighed the aggravating circumstances. The heart of Tichnell's case before the sentencing jury was that he shot Deputy Livengood in self-defense at point-blank range as the two men struggled at the open door of Tichnell's car. The State's theory of the case was that Tichnell, to avoid apprehension, ambushed the deputy and shot him in the back — not in a face-to-face confrontation at the door of the car — but from a distance greater than three feet, as evidenced by the fact that no powder burns were found on the clothing of either Tichnell or Livengood. The trial testimony of the State's witness, Wolfe, if believed by the sentencing jury, was, for example, wholly inconsistent with Tichnell's version of the shooting.[5] Five spent shells found in close proximity to the deputy's body constituted evidence that he had been shot at some distance from where Tichnell's car was located. Other evidence adduced by the State, through the testimony of its witnesses at trial, permitted a jury to rationally find that the shooting could not have occurred as Tichnell said it did. *See Tichnell v. State,* 287 Md. at 700-09 and 719-20. Had Tichnell been believed on the other hand, the jury would not have found him guilty of premeditated first degree murder. Witness credibility was therefore of extreme importance, both at the trial and at the sentencing hearing.

The practical burden which Tichnell faced was to demonstrate to the sentencing jury, during presentation of the State's case on aggravating circumstances, that the shooting did not occur, as the prosecution claimed, in furtherance of an escape or attempt to evade or escape from lawful custody. It was of vital importance to Tichnell that he entirely negate that critical aggravating circumstance, or otherwise lessen its gravity, or obtain some corroboration of his own testimony, and hence favorably affect the weight which the jury would give to the aggravating circumstance in the ultimate

---

5. Wolfe's house overlooked the scene of the shooting. At trial, he testified to hearing a burst of gunfire, followed almost immediately by the sound of spinning wheels and a simultaneous volley of additional shots.

weighing process. Tichnell's ability to do so mainly depended on an opportunity to cross-examine the State's witnesses and to thereby convince the sentencing jury that the testimony of those witnesses was not credible. Manifestly, this probing of the strength of the State's case on aggravating circumstances could not be achieved absent testimony from live prosecution witnesses. Moreover, Tichnell's need in the first instance to cross-examine the State's witnesses in an effort to weaken the strength of the prosecution's case bore importantly on his own testimony as to mitigating circumstances and, in particular, under § 413 (g) (3), whether in killing the deputy he acted "under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution." In the overall, the demeanor and credibility of the State's witnesses, as well as his own, was of critical importance to the sentencing jury in determining whether aggravating circumstances existed and, if so, whether the mitigating circumstances outweighed the aggravating circumstances. Indeed, it was a matter of life or death, of the gravest import, not just to Tichnell but to society itself.

Our research discloses no case like that now before us, challenging the admission in evidence of prior recorded trial testimony to sustain the State's burden of demonstrating the existence of aggravating circumstances, at a separate sentencing hearing, under a capital sentencing statute. Of some significance, however, is *Brady v. State,* 226 Md. 422, 174 A.2d 167 (1961), a case in which Brady and a confederate, Boblit, had committed a murder in the course of a robbery. Brady was found guilty by a jury of first degree murder; under a then existing statute, the jury could have, but did not, add to its guilty verdict the words "without capital punishment." Had it done so, the sentencing judge could not have imposed the death penalty. After the trial judge sentenced Brady to death, Brady filed a post conviction petition claiming that at his trial the State withheld evidence from the jury that Boblit confessed that it was he, and not Brady, that had actually murdered the victim. We concluded that the withholding of Boblit's confession from

the jury prejudiced Brady but only as to the sentence imposed upon him. We said that if Boblit's withheld confession had been before the jury, nothing in it could have reduced Brady's offense below murder in the first degree and consequently there was no reason to retry that issue. We said (226 Md. at 430):

"Brady is entitled to have a jury empaneled to determine whether the finding already made of guilty of murder in the first degree should or should not be modified by the addition of the words 'without capital punishment'; and to that end any admissible evidence bearing on that question should be submitted to the jury which either the State or the defendant may deem it appropriate to present. *This may require to a large extent a duplication of the evidence submitted at the first trial . . . .*" (Emphasis supplied.)

The emphasized language tends to indicate that the Court contemplated that the witnesses at trial would be required to testify at the sentencing hearing before the new jury, at least absent a showing of unavailability.

Absent agreement of the parties, or a showing of unavailability of the witnesses to testify at the separate sentencing hearing, we conclude that § 413 (c) does not permit, over timely objection, the admission in evidence before a new sentencing jury of the prior recorded trial testimony to prove the existence or absence of aggravating or mitigating circumstances. That the State's witnesses were available and desired to testify before the sentencing jury is conceded by the State; therefore, the lower court erred in admitting the challenged evidence and a new sentencing hearing is necessary. On remand, the trial judge should permit the State to produce whatever relevant and admissible evidence it may wish to present to the sentencing jury through the testimony of its witnesses. Manifestly, there is

no requirement that this evidence be a carbon copy of that presented at the guilt stage of the bifurcated proceeding.[6]

Tichnell raised six other objections to the imposition of the death sentence in this case. Three were raised and found without merit in *Tichnell v. State, supra.* Another claimed that the second sentencing hearing constituted double jeopardy. Still another claimed a deprivation of the right to counsel. There was also a contention of prejudice by adverse newspaper publicity on the morning of the commencement of the second hearing. None of the contentions is supported by serious argument, and all are without merit.

> *Death sentence vacated; case remanded for a new sentencing proceeding under § 413 of Article 27; costs to be paid by the County Commissioners of Garrett County.*

Judge Davidson concurs in the result.

---

**6.** Without discussion as to the effect of the confrontation clause on the use of prior recorded testimony, the Virginia Supreme Court, in three cases, has summarily approved the introduction of trial transcripts at capital sentencing hearings. *See* Fogg v. Commonwealth, 215 Va. 164, 207 S.E.2d 847 (1974); Huggins v. Commonwealth, 213 Va. 327, 191 S.E.2d 734 (1972); Snider v. Cox, 212 Va. 13, 181 S.E.2d 617 (1971).