STATE of Utah, Plaintiff and Appellee,

v.

Douglas Stewart CARTER, Defendant and Appellant.

No. 920110.

Supreme Court of Utah.

Jan. 18, 1995.

R. Paul Van Dam, Atty. Gen., Carol Clawson, J. Kevin Murphy, Asst. Attys. Gen., Salt Lake City, for plaintiff.

Craig M. Snyder, Linda J. Barclay, Provo, for defendant.

## DURHAM, Justice:

Defendant Douglas Stewart Carter appears before this court on appeal for a second time. In December 1985, Carter was convicted of murder in the first degree, in violation of Utah Code Ann. § 76–5–202 (Supp.1985),[1] and was sentenced to death. In his first appeal, *State v. Carter*, 776 P.2d 886 (Utah 1989) *("Carter I")*, we affirmed the murder conviction but vacated the death sentence due to an erroneous jury instruction on aggravating circumstances and remanded the case for a new sentencing proceeding.

The second penalty hearing was held in January 1992 ("the 1992 penalty hearing").[2] At the conclusion of the 1992 penalty hearing, a jury again unanimously rendered a verdict of death. Carter appeals from this second death sentence, having obtained an order staying his execution pending appeal. He also raises new issues, purportedly not raised in his first appeal, in a renewed challenge to the underlying murder conviction. We affirm Carter's conviction and sentence.

We deal first with those issues challenging the underlying murder conviction and then turn to Carter's arguments regarding the 1992 penalty hearing. Carter raises two claims of error with respect to his underlying conviction: (1) the denial of his January 1992 motion for a new trial and motion in limine to exclude evidence or alternatively to suppress,[3] and (2) the refusal to suppress his confession made to law enforcement officials in Nashville, Tennessee.[4]

With respect to the 1992 penalty hearing, Carter makes the following arguments and claims of error: (1) Utah Code Ann. § 76–3–207(4) is unconstitutional on its face and as applied to this case, under both the United States and Utah Constitutions; (2) the trial court committed reversible error in allowing the jury to consider the allegedly heinous nature of the crime as an aggravating circumstance in determining his sentence; (3) the trial court erred by refusing to excuse for cause potential jurors who exhibited substantial bias and/or physical incapacity; (4) the trial court erred by admitting victim impact evidence; (5) the trial court erred by admitting evidence of the alleged rape of the victim; (6) the jury did not unanimously and specifically find, beyond a reasonable doubt, each aggravating factor relied on in imposing its sentence; and (7) the Utah capital sentencing scheme violates the United States and Utah Constitutions.

## I. FACTS AND PROCEDURAL HISTORY

Given the long and complex history of this case, we undertake a complete recitation of the facts. On the night of February 27, 1985, Orla Oleson discovered his wife, Eva, mur

---

1. Now referred to as "aggravated murder" under Utah Code Ann. § 76–5–202 (Supp.1993).

2. Carter was represented by new counsel during the 1992 penalty hearing. That same counsel acts as co-counsel on this appeal.

3. We recognize that Carter's motion in limine to exclude evidence or alternatively to suppress applies to the 1992 penalty hearing rather than the 1985 guilt phase proceeding. However, Carter supported the alternative motions on identical

grounds, and the trial court dismissed both on identical grounds. Thus, we address them together.

4. Carter also filed a supplemental pro se brief challenging the sufficiency of the 1985 information and jury instructions. We find these arguments to be without merit and, with respect to the jury instructions, not timely raised under rule 26(9) of the Utah Rules of Criminal Procedure.

dered in their Provo, Utah home. The medical examiner testified that Mrs. Oleson had been stabbed eight times in the back, once in the abdomen, and once in the neck. The examiner further stated that Mrs. Oleson had received a fatal gunshot wound to the back of her head. Apparently, the murderer fired the gun at point blank range through a pillow to muffle the sound. Other testimony revealed that Mrs. Oleson's hands had been tied behind her back with a telephone cord and that her pants and pantyhose had been pulled down (or off) and lay at her feet. Her sanitary pad had been removed and also lay at her feet.

A specialist with the Bureau of Alcohol, Tobacco, and Firearms determined that the markings on the slug removed from the body were consistent with those produced by a .38 special handgun. However, the police could not locate the weapon at the murder scene. The knife used to inflict the stab wounds came from the Olesons' kitchen and was discovered on the floor near the body.

Carter first surfaced as a possible suspect in the case in early to mid-March 1985. The police included Carter's name on the original list of suspects for two reasons: (1) An eyewitness identified Carter as the probable perpetrator of an attempted "automobile trespass" which occurred about an hour or two prior to the murder in the same general area, and (2) the police received information that Carter's wife, Anne, on learning of the homicide, had told someone that she rushed home to see if her husband was involved.

Following these leads, on March 14, 1985, the police met with Carter and questioned him about both the automobile trespass charge and the Oleson homicide. Although Carter admitted that he knew Mrs. Oleson[5] and could not account for his whereabouts on the night of the murder, he denied committing the crime. Carter was fingerprinted and released.

On March 20, 1985, the police again questioned Carter regarding the homicide. The police told him that they doubted his truthfulness because of some discrepancies be-

tween his and his wife's statements. Carter asserted that he was telling the truth. The police then obtained Carter's permission to take hair samples to compare with those found at the crime scene. The police learned a short time later that none of the hair samples taken from the Oleson residence belonged to an individual of Carter's race, African-American. As of this date, Carter was one of about eight suspects in the homicide.

Carter did not emerge as the prime suspect until April 8, 1985, when his wife sought legal advice from Deputy Utah County Attorney Sterling Sainsbury and private attorney Robert Orehoski. On the morning of April 8, Anne Carter approached Sainsbury, whom she knew through her position as a clerk for the juvenile court, and told him that she thought her husband had been involved in the Oleson murder. According to Sainsbury, Anne Carter suspected that her missing handgun, a .38 special, was the murder weapon and she showed Sainsbury the receipt for its purchase. She feared that she would be implicated as an accessory to the crime because she owned the handgun and it was improperly registered. Finally, she mentioned that some of Carter's clothes appeared to be bloodstained.

Sainsbury informed her that he was not her lawyer and that as a Deputy Utah County Attorney, he had a duty to report her story to the County Attorney's Office. He then advised her to meet immediately with a private attorney and come forward with the information voluntarily. Early that afternoon, Sainsbury sought out the prosecutor assigned to the Oleson case, Deputy Utah County Attorney Wayne Watson, and related Anne Carter's statements.

Anne Carter then approached Robert Orehoski, a private attorney who was representing her in a divorce action. Coincidentally, Watson was Orehoski's private law partner. Anne Carter told Orehoski that Carter had given her information about the Oleson murder and that she was worried the missing handgun would be traced to her. Orehoski

---

5. Anne Carter sold health care products to Mrs. Oleson. On one occasion, Anne found a wallet belonging to the Olesons' son and returned it to their home, accompanied by Carter. At that time, Anne told Carter that Mrs. Oleson had "nice jewelry from around the world."

recommended that she seek a conditional grant of immunity in exchange for her information.

The parties dispute what occurred at this point. The State claims that Anne Carter agreed to Orehoski's proposal and requested that he contact the County Attorney's Office. According to the State, Orehoski then contacted Watson and, without revealing Anne Carter's identity, described the proposed deal of conditional immunity in return for information. Watson accepted the proposal and produced a signed, handwritten conditional grant of immunity which he gave to Anne Carter in exchange for her information. Carter, on the other hand, asserts that Orehoski invited Watson into his office to question Anne regarding Carter's involvement in the murder. Carter further asserts that Anne did not understand why Orehoski wanted her to speak with Watson, but she acquiesced because of Orehoski's representation regarding the conditional grant of immunity. As a result of Anne's disclosure, Carter claims that the focus of the investigation shifted from Orla Oleson to Carter.

Pursuant to Anne Carter's consent, Provo police officers searched the Carter home, hoping to discover the missing handgun. Although they did not find the weapon, they discovered several articles of clothing that appeared to be bloodstained. The officers then requested, and Anne Carter signed, a new consent warrant permitting police to search for and seize any article of evidentiary value. A search warrant was simultaneously obtained from the local circuit court. Pursuant to these new warrants, the officers seized several articles of bloodstained clothing and copper-jacketed .38 caliber ammunition similar to that used in the homicide.

Later that day, Anne Carter met with Provo police officers to give a formal statement. At first, she refused to recount the information she had given to Watson and Orehoski. However, she grew more cooperative when a new officer was assigned to take her statement and, after some hesitation,

provided the following account of Eva Oleson's murder. On the evening of February 27, 1985, Carter went to visit his friend, Epifanio Tovar. While at the Tovar residence, Carter met two of Tovar's friends. One of the men was a recently escaped convict who held a grudge against Provo Police Chief Swen Nielsen, a relative of Eva Oleson. The three men decided to go to the Oleson residence and steal Mrs. Oleson's gold necklace. On arriving at the Oleson home, Carter waited in the car while the other two men knocked on the door and entered. Carter did not know that Mrs. Oleson had been murdered until the men returned with blood on their clothing and one of them said "she's dead." Carter also told Anne that he got Mrs. Oleson's blood on his clothes when he reached out and pulled one of the men into the car.

As a result of the information received from Anne Carter, the police identified several witnesses, including Epifanio and Lucia Tovar. The Tovars gave a very different account of the murder, stating that Carter was the sole perpetrator and even bragged of his deed. The State relied heavily on the Tovars' incriminating testimony at trial. Anne Carter's statements also provided authorities with the identity and ownership of the .38 special murder weapon,[6] the .38 caliber bullets taken from Carter's possession, and Carter's bloodstained clothing.

On April 11, 1985, a warrant was issued for Carter's arrest for the Oleson homicide. The following day, the State filed an information charging Carter with capital murder. After fleeing from Utah authorities, Carter was located and arrested in Nashville, Tennessee. While at the Nashville jail, Carter was interviewed first by Nashville authorities and then by Lieutenant George Pierpont of the Provo City Police Department, who had been sent to extradite Carter to Utah. After receiving *Miranda* warnings, Carter voluntarily confessed to Lieutenant Pierpont.

The guilt phase of Carter's trial began on December 17, 1985. The State theorized

6. The authorities never located the missing handgun. Testimony revealed that Carter had hidden it in a portable whirlpool and then stored the machine at various friends' homes. Approxi-

mately a week before the 1985 trial, Epifanio Tovar admitted that at Carter's request, he had taken the handgun out of the whirlpool and thrown it into the Spanish Fork River.

that Carter acted alone in the homicide and presented its witnesses and evidence accordingly. Carter put on no live witnesses but did present two psychiatric reports for mitigation during the penalty phase.

On December 18, 1985, a jury unanimously found Carter guilty of murder in the first degree. A special verdict revealed that the jurors had found two aggravating circumstances beyond a reasonable doubt: Carter had murdered Eva Oleson while he was engaged in the commission of or an attempt to commit aggravated burglary, and the homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner. The penalty phase followed a day later, and on December 19, 1985, the jury sentenced Carter to death.

In *Carter I*, Carter appealed the 1985 verdict and death sentence on several grounds. We reached the following conclusions in that appeal: (1) Carter's confession was voluntary, and the trial court correctly denied his motion to suppress; (2) Carter's Fifth Amendment rights were not prejudiced when the State referred to the lack of testimony regarding the allegedly coerced confession; (3) Carter was not prejudiced by the trial court's decision to allow a Provo police officer to remain at the prosecution table and then to testify for the State; and (4) Carter was not denied effective assistance of counsel. *Carter I*, 776 P.2d at 890–94.

Despite the foregoing, we vacated Carter's death sentence and remanded for a new penalty proceeding because we found manifest error committed during the penalty phase. Pursuant to Utah Code Ann. § 76-5-202(1)(q), the trial court instructed the jury that it could convict Carter of first degree murder if it found that the intentional or knowing homicide was "committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner." *Id.* at 895. As mentioned above, the jury expressly found this particular aggravating factor and then considered it when making its penalty determination. However, the trial court failed to further instruct the jury that the aggravating factor contained in subsection (1)(q) "must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the

victim before death." *Id.* Faced with this manifest error, we remanded for a new sentencing phase because we could not "conclude that [Carter] was not prejudiced by the subsection (1)(q) instructional error and its effective incorporation into the penalty phase." *Id.* at 896.

In preparation for the second penalty hearing, on March 23, 1990, the State filed its proposed method of presentation of the case, in which the State proposed to call witnesses who testified at the previous trial and sentencing phase. Pursuant to Utah Code Ann. § 76-3-207(4), the State also sought to introduce all the exhibits from the original trial, along with a transcript of all properly admitted testimony. This "Abstract from Transcript of Trial" (the "Abstract") contained all testimony introduced by either party at the original guilt and sentencing proceedings. However, the State had "cleaned up" the transcript by deleting counsels' arguments, motions, and objections. The State intended that the Abstract be admitted as an exhibit for the jury to take into the jury room. In addition, the State declared its intent to read excerpts from the Abstract—in particular, portions of the Tovars' testimony—directly to the jury.

On October 4, 1990, Carter filed a motion and memorandum opposing the State's proposed method of presenting its case. On January 30, 1991, the trial court denied Carter's motion to exclude the transcribed prior testimony. Carter then filed an interlocutory appeal, asking us to review the trial court's decision. On April 11, 1991, we denied Carter's interlocutory appeal. On January 16, 1992, the trial court denied Carter's motion to prevent the Abstract from being admitted as an exhibit.

On September 28, 1990, Carter filed a discovery request seeking, inter alia, the original tape recording of his confession and all evidence known to the State that tended to mitigate his guilt. The State responded that it could not produce the original tape recording, as it had been destroyed. As for any possible exculpatory evidence, the State replied that all evidence in any way relevant to the case and known to the State was

included in police reports long ago made available to Carter.

On October 4, 1990, Carter filed a motion in limine to prohibit the introduction into evidence of any reference to the aggravating facts contained in Utah Code Ann. § 76–5–202(1)(q). The trial court denied Carter's motion on January 30, 1991. On January 16, 1992, Carter again unsuccessfully moved to prevent the instruction of the jury on the heinous nature of the crime as an aggravating circumstance.

On January 16, 1992, about one week before the penalty hearing, the trial court heard several motions, including Carter's motion for a new trial and motion in limine to exclude evidence or alternatively to suppress. These latter motions dealt with the issues surrounding the statement made by Anne Carter to Orehoski, Watson, and the Provo police officers. The trial court denied both motions on January 17, 1992.

The second penalty hearing began on January 21 and concluded on January 23, 1992. During voir dire, Carter challenged for cause several jurors, including Alan Manwaring, Connie Lynne Fausett, and Nancy Zabel. Carter claimed that these three in particular gave answers which indicated substantial bias and/or physical incapacity to serve as a juror. The trial court refused to dismiss the jurors, and Carter later excused all three with peremptory challenges.

At the 1992 penalty hearing, the State introduced the Abstract, which contained the statements of all witnesses who testified at the 1985 guilt and sentencing proceedings. Carter again unsuccessfully objected to the State's plan to read selected excerpts from the document and also to its entry into evidence as an exhibit. Accordingly, the State read from the transcript and entered it into evidence.

At the conclusion of the hearing, Carter requested an instruction requiring the jury to find unanimously and specifically each aggravating factor relied on in reaching a sentence. Carter also submitted a special ver-

dict form for the jury to use in this regard. The trial court refused the proposed instruction and special verdict form. The court's instructions to the penalty jury included an instruction on heinousness as an aggravating factor, despite Carter's earlier objections.

The jurors took the exhibits, including the Abstract, into the jury room. After deliberating for approximately six hours, on January 23, 1992, the jury unanimously rendered a verdict of death. Carter again appeals his death sentence to this court.

## II. CONVICTION–RELATED ISSUES

### A. Carter's Motion for a New Trial and Motion in Limine to Exclude Evidence or Alternatively to Suppress

On January 8, 1992, Carter filed a motion for a new trial and a motion in limine to exclude evidence or alternatively to suppress. These motions were based on the same grounds and alleged that newly discovered information—i.e., the circumstances surrounding Anne Carter's statements to authorities—undermined Carter's guilty verdict and mandated a new trial or the exclusion/suppression of certain inculpatory evidence at the 1992 penalty hearing. Carter supported the motions with a variety of interrelated arguments. To begin, Carter claimed that Anne's disclosures violated the marital privilege rights contained in article I, section 12 of the Utah Constitution[7] and section 78–24–8(1) (1985) of the Utah Code. Admitting the subsequently discovered "tainted" evidence, continued Carter, in effect violated his right against self-incrimination guaranteed by the state and federal constitutions.

Carter's January 1992 motions further asserted that the State improperly obtained statements, and ultimately evidence, from Anne Carter by exploiting two related, undisclosed conflicts of interest. First, Carter claimed that Orehoski gave Anne the impression that he would represent her in the matter without disclosing that the prosecutor assigned to Carter's case, Wayne Watson,

---

7. The marital privilege contained in article I, section 12 of the Utah Constitution is codified at Utah Code Ann. § 77–1–6 (1990). However, Carter does not assert a claim under section 77–1–6.

was also his private law partner. Second, Carter alleged that Watson also had a conflict of interest because Watson used Anne Carter's relationship with Orehoski to obtain statements from her. Intertwined in this argument is the implication that Orehoski breached the attorney-client privilege and that Watson engaged in prosecutorial misconduct. Finally, Carter's motions asserted that he was denied effective assistance of counsel by his original counsel's failure to raise these claims if they were known, or could have been discovered.

The trial court denied both motions on the same ground, ruling that "the marital privilege is a testimonial privilege and does not preclude law enforcement from pursuing additional information and leads from the information supplied by [Carter's] wife in this case." The trial court further determined that the State's failure to provide counsel with a copy of the conditional grant of immunity "[did] not result in an error or impropriety which had or would have a substantial adverse effect upon the rights of [Carter]."

The primary thrust of Carter's argument on appeal is that the violation of the marital privilege, combined with Orehoski's breach of the attorney-client privilege and the undisclosed conflicts of interest, improperly led to the State's discovery of incriminating evidence.[8] Thus, the "tainted" evidence should have been suppressed at the 1985 and 1992 proceedings. Carter also argues that he was denied a fair trial because the State improperly withheld certain exculpatory evidence[9] and that his original attorney's failure to address these matters amounted to ineffective assistance of counsel.

■ The first portion of Carter's argument rests on the assumption that the mari-

tal privilege recognized in Utah law extends beyond the witness stand. This assumption is wrong. Carter relies on section 78–24–8(1) of the Utah Code and article I, section 12 of the Utah Constitution in support of his argument. As written in 1985,[10] these standards provided:

> [A] wife shall not be compelled to testify against her husband, nor a husband against his wife....

Utah Const. art. I, § 12 (codified at Utah Code Ann. § 77–1–6(2)(d) (1982)).

**Privileged Communications.** There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate. Therefore, a person cannot be examined as a witness in the following cases:

> (1) A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either during the marriage or afterwards be, without the consent of the other, examined as to any communication made by one to the other during the marriage
>
> . . . .

Utah Code Ann. § 78–24–8(1) (Supp.1985).

■ While we have not expressly stated that the marital privilege applies only to testimonial evidence given or sought to be introduced within the courtroom, we agree with the United States Supreme Court's position in *Trammel v. United States,* 445 U.S. 40, 52 n. 12, 100 S.Ct. 906, 913 n. 12, 63 L.Ed.2d 186 (1980), that the marital privilege does not "prevent[ ] the Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension. It is only the spouse's testi-

---

**8.** According to Carter, the improperly obtained incriminating evidence included his confession, the .38 caliber ammunition and bloodstained clothing found at his home, and the Tovars' inculpatory testimony.

**9.** The alleged improperly withheld exculpatory evidence includes Anne Carter's alternative account of the murder, the conditional grant of immunity, and police reports indicating that neither Carter's fingerprints nor African–American hair samples were found at the murder scene.

**10.** The marital privilege contained in article I, section 12 of the Utah Constitution has remained constant. However, the statutes and rules codifying this privilege have been revised several times over the last decade. Currently, rules 502 and 507 of the Utah Rules of Evidence govern this area.

We note that today's decision construes the marital privilege as it existed under section 78–24–8(1) (Supp.1985). This opinion does not determine the nature or scope of the marital privilege embodied in superseding rules 502 and 507.

mony in the courtroom that is prohibited."[11] The State is free to interrogate and receive information from a witness spouse on any matter, including confidential communications, so long as the witness spouse's statement is not introduced into evidence at trial over the objections of the accused spouse. Moreover, the State is free to act upon any information received—it may pursue leads, obtain evidence, locate witnesses, or engage in any other lawful investigative procedure. Evidence discovered as a result of the witness spouse's statements and the State's subsequent investigation is admissible in court, subject to any relevant constitutional, statutory, or evidentiary rules of exclusion.

Based on the above discussion, we find Carter's argument to be without merit. Anne Carter did not take the stand, nor were her statements introduced into evidence in the form of a deposition or affidavit. Carter could not, in 1985 or 1992, invoke the marital privilege to prevent the admission of his confession and other incriminating evidence derived from Anne Carter's disclosures. Moreover, we note that our review of the record reveals that Anne Carter's statements to Orehoski, Watson, and the Provo City police were given voluntarily. Accordingly, we affirm the trial court's ruling that the marital privilege is an in-court testimonial privilege and does not preclude law enforcement from pursuing additional information and leads from the information supplied by Anne Carter.[12]

■ We similarly find Carter's attorney-client privilege argument to be without merit. At the time of Anne Carter's disclosure, the attorney-client privilege was codified at section 78–24–8(2) of the Utah Code:

An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given therein, in the course of professional employment; nor can an attorney's secretary, stenographer, or clerk be examined, without the consent of his employer, concerning any fact, the knowledge of which has been acquired in such capacity.

Utah Code Ann. § 78–24–8(2) (1985).

Carter's invocation of the attorney-client privilege reveals a flawed understanding of that concept. "The privilege belongs to the client and he [or she] may waive it or enforce it as to him [or her] may seem proper.... The sole purpose of the privilege was [and is] to protect the client's interest." *In Re Young's Estate*, 33 Utah 382, 387, 94 P. 731 (1908). The attorney-client relationship at issue in this case existed between Anne Carter and Orehoski. If Orehoski acted improperly, Anne Carter is the injured party and only she may assert a claim. Carter has no standing to assert the attorney-client privilege on her behalf.[13]

■ We are likewise unconvinced that the alleged newly discovered exculpatory evi-

11. Our prior case law suggests support for this conclusion. See, e.g., *State v. Smith*, 726 P.2d 1232, 1236–37 (Utah 1986) (finding marital privilege unsuccessfully invoked at trial to prevent spouse's in-court testimony); *State v. Benson*, 712 P.2d 256, 258–59 (Utah 1985) (same); *State v. Bundy*, 684 P.2d 58, 60–61 (Utah 1984) (same); *State v. Trevino*, 574 P.2d 1157, 1158 (Utah 1978) (holding that marital privilege does not prevent spouse from voluntarily testifying at trial on his or her own behalf); *State v. Trusty*, 502 P.2d 113, 114–15 (Utah 1972) (holding marital privilege not violated by prosecutor's in-court reference to possible trial testimony of defendant's spouse); *State v. Brown*, 395 P.2d 727, 728 (Utah 1964) (holding defendant not prejudiced by prosecutor's comment indicating that spouse had asserted marital privilege to avoid testifying at first trial); *State v. Brown*, 14 Utah 2d 324, 383 P.2d 930, 932 (1963) (finding defendant prejudiced by prosecutor's comment that spouse had invoked the marital privilege and refused to testify at

trial); *State v. Cox*, 106 Utah 253, 147 P.2d 858, 859 (1944) (finding that failure to object at trial implied consent to introduction of former spouse's testimony regarding allegedly privileged communications). In contrast, Carter has failed to cite any legal authority supporting his position.

12. We note in passing that Carter's attempt to link the alleged marital privilege violation to his right against self-incrimination under the state and federal constitutions also fails. Carter was not forced to testify, nor were his statements entered into evidence against him. Thus, Carter's right against self-incrimination is not implicated.

13. We are also unpersuaded by Carter's undisclosed conflict-of-interest theory. As in the attorney-client privilege context, if any wrongdoing occurred, Anne Carter is the aggrieved party.

dence, including Anne Carter's alternate account of the murder, the conditional grant of immunity, and the lack of fingerprint or hair evidence, required a retrial or exclusion/suppression of incriminating evidence at the 1992 penalty hearing. Anne Carter's alternate account of the murder and the fact that she knew of it cannot possibly be construed as newly discovered evidence. If Carter provided Anne with the story, he knew that he had done so. Thus, Carter was aware of both the evidence and the possibility of Anne's corroboration before the 1985 trial.

■ With respect to the conditional grant of immunity, we note that Carter claims he remained totally unaware of the circumstances under which the State obtained Anne Carter's statement until December 1991, when Anne informed Carter of the 1985 events. The State, on the other hand, insists that it was unaware of the conditional grant of immunity until Carter attached a copy to his January 1992 motions.[14]

While the State's inability to properly maintain its files is of concern, we do not see how Carter was prejudiced by the State's failure to provide him with a copy of the conditional grant of immunity. Whether or not it was necessary, Anne Carter cut a deal with the State. That deal led the State to evidence that independently established Carter's guilt. Simply put, the conditional grant of immunity was, and remains, irrelevant to Carter's guilt. We agree with the trial court that the State's failure to provide Carter with a copy of the document "[did] not result in an error or impropriety which had or would have a substantial adverse effect upon the rights of the defendant."[15]

■ As for the lack of Carter's fingerprints and African–American hair samples at the murder scene, we fail to see how such evidence exculpates Carter. Moreover, our review of the record reveals that this "evidence" has been in the State's files and available to Carter—through the State's open-file policy—since 1985. Thus, even if they had merit, the claims were waived when they were not raised on Carter's first appeal. Utah R.Crim.P. 26(9).

We find Carter's ineffective-assistance-of-counsel contention inapposite as to some claims and untimely raised as to others. Our standard is as follows:

"To prevail, a defendant must show, first, that his [or her] counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant."

*State v. Germonto,* 868 P.2d 50, 61 (Utah 1993) (quoting *Bundy v. DeLand,* 763 P.2d 803, 805 (Utah 1988)). A defendant must meet both burdens to prevail on an ineffectiveness claim. *Id.; Parsons v. Barnes,* 871 P.2d 516, 522–23 (Utah 1994); *State v. Templin,* 805 P.2d 182, 186 (Utah 1990). However, we reiterate that we need not address both parts of the test if a defendant fails to meet his or her burden on one. *See Parsons,* 871 P.2d at 522–24; *Germonto,* 868 P.2d at 60–61; *Bundy v. DeLand,* 763 P.2d 803, 805–06 (Utah 1988).

We need not discuss the first part of the test because Carter has clearly failed to meet the burden imposed by the second. The performance rendered by Carter's original counsel did not prejudice him. As we have made clear, neither Anne Carter's statement, the conditional grant of immunity, nor the hair and fingerprint evidence tend to exculpate Carter.

Finally, we note that we addressed and rejected a similar ineffective-assistance-of-counsel claim raised by Carter on his first appeal. Specifically, Carter's brief in that case argued:

---

**14.** Apparently, Wayne Watson had left the Utah County Attorney's Office several years earlier and never placed the document in the State's files.

**15.** Moreover, we note that Carter expressly asserts that he does not suggest any impropriety on the part of attorney Sainsbury. This is significant because Sainsbury reported his conversation with Anne Carter to Watson *before* Watson

met with her and Orehoski. Given Sainsbury's information, it is quite likely that the authorities would have independently sought out Anne Carter and obtained a warrant to search the Carter home. Thus, the State almost certainly would have discovered the incriminating evidence independent of Anne's later disclosure to Orehoski, Watson, and the Provo City police.

Other than prepare the motions for [Carter, his original] counsel did not engage in other extensive investigation. He made no motion for discovery nor did he make an effort to examine evidence held by the county attorney. He did not attempt to get expert testimony supporting [Carter's] motion for change of venue. [Carter's original] counsel never made an attempt to obtain the tape recording made of [Carter] at the time he gave his statement to determine if it corresponded with the statement that [Carter] made to Detective Pierpont.

Because Carter makes these same arguments in the case at hand, his ineffective-assistance claim is doubly flawed. *See* Utah R.Crim.P. 26(9). We reaffirm our conclusion in *Carter I* that Carter's "claims of ineffective assistance of counsel are ... without merit." 776 P.2d at 894.

B. *The Trial Court's Refusal to Suppress Carter's Confession Made to Law Enforcement Officials in Nashville, Tennessee*

In a second attack on his original conviction, Carter asks us to revisit an issue already raised and rejected in *Carter I*. He moved to suppress his confession before the original guilt phase of his trial in 1985. The trial court denied the motion, and we affirmed on appeal. 776 P.2d at 890–91. Prior to the 1992 penalty hearing, Carter's new counsel renewed the motion to suppress and requested a copy of the tape recording of Carter's 1985 confession. In response to Carter's discovery request, the State replied that the tape was never taken into evidence and had been destroyed.

Carter now claims that we should reverse our earlier ruling upholding the trial court's finding of voluntariness because of the interplay of a variety of factors. He argues that the "highly irregular" confession procedure, when combined with the destroyed tape recording, withheld exculpatory evidence, and allegations that the officer who took his confession, Lieutenant Pierpont, regularly employed coercive tactics, demonstrates that we erred in *Carter I*.

We decline Carter's invitation to overturn our earlier determination. As we noted in *Carter I*, the State bears the burden of proving by at least a preponderance of the evidence that a defendant's confession was voluntary. 776 P.2d at 890 (citing *State v. Bishop*, 753 P.2d 439, 463–64 (Utah 1988)). Voluntariness is determined by the totality of the circumstances surrounding the accused and his or her interrogation. *Id.* While we still do not sanction the particular manner in which Carter's confession was taken,[16] we remain convinced that under the totality of the circumstances, the State met its burden of proof and the trial court correctly admitted the confession.

### III. CLAIMS CHALLENGING THE 1992 PENALTY HEARING

A. *Constitutionality of Section 76–3–207(4) of the Utah Code*

 Carter asserts that section 76–3–207(4) of the Utah Code is unconstitutional, both facially and as applied to him, under the Utah and United States Constitutions. That provision establishes, inter alia, evidentiary guidelines for capital resentencing proceedings. This section 76–3–207(4) provides in relevant part:

In cases of remand for new sentencing proceedings, all exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing proceedings shall be admissible in the new sentencing proceedings....

Utah Code Ann. § 76–3–207(4) (1990).

Carter complains that the statute permits the use of a transcript of prior testimony without meeting the confrontation safeguards established in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and adopted by this court in *State v. Brooks*, 638 P.2d 537, 539 (Utah 1981). In *Roberts*, the United States Supreme Court held:

[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his

---

16. Lieutenant Pierpont dictated the confession, stopping every few lines to ask Carter whether it was accurate. The confession was then reduced to writing and signed. *Carter I*, 776 P.2d at 890.

statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66, 100 S.Ct. at 2539. Because section 76–3–207(4) does not recognize the *Roberts* standards, Carter claims that the provision violates a capital defendant's constitutional right to confront adverse witnesses. To the extent that these rights are denied, continues Carter, a capital defendant's right to due process is also denied.

Although a transcript of all testimony properly admitted at the prior trial and sentencing proceedings is clearly admissible under the terms of section 76–3–207(4), we have previously recognized that

> admission of certain evidence could be justified under a hearsay exception, yet still violate the defendant's constitutional right of confrontation.... The critical inquiry is whether the values embodied in the confrontation clause are impinged upon by the admission of the hearsay and, if so, whether there are adequate safeguards to protect those values.

*State v. Webb,* 779 P.2d 1108, 1111–12 (Utah 1989) (citations omitted). Applying the first portion of this critical inquiry to the present context, we find that the prior hearsay testimony permitted under section 76–3–207(4) impinges on a capital defendant's right to confrontation. "The essence of the confrontation right is the opportunity to have the accusing witness in court and subject to cross-examination, so that bias and credibility can be evaluated by the finder of fact." *State v. Nelson,* 725 P.2d 1353, 1356 (Utah 1986). Because section 76–3–207(4) permits the introduction of a transcript of prior testimony, a capital defendant may be denied the opportunity to cross-examine and "sift the conscience" of adverse witnesses. Further, the fact finder may be denied the opportunity to make principled evaluations of a witness's demeanor and credibility.

Having determined that a capital defendant's right to confrontation is implicated, we turn to the second part of *Webb's* critical inquiry, whether there are adequate safeguards to protect those values. The plain language of section 76–3–207(4) contains no safeguards, adequate or otherwise. However, "this Court has a duty to construe a statute whenever possible so as to effectuate legislative intent and avoid and/or save it from constitutional conflicts or infirmities." *State v. Bell,* 785 P.2d 390, 397 (Utah 1989) (plurality opinion); *see also State v. Wood,* 648 P.2d 71, 82 (Utah) ("[W]e construe statutes, if possible, to avoid the risk of running afoul of constitutional prohibitions."), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). Thus, to protect a capital defendant's confrontation and due process rights under section 76–3–207(4), we incorporate into that provision the safeguards articulated by the United States Supreme Court in *Roberts* and adopted by this court in *Brooks.* *See Tichnell v. State,* 290 Md. 43, 427 A.2d 991, 1001 (1981) ("Absent agreement of the parties, or a showing of unavailability of the witnesses to testify at the separate sentencing hearing, we conclude that § 413(c) [of Maryland's capital sentencing scheme] does not permit, over timely objection, the admission in evidence before a new sentencing jury of the prior recorded trial testimony to prove the existence or absence of aggravating or mitigating circumstances."), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

In addition, we add two other procedural safeguards and one condition. First, we construe section 76–3–207(4) as permitting the admission of prior testimony in oral form only. *See id.* 427 A.2d at 993, 1001. Second, we hold that the written transcript should not be admitted into evidence as an exhibit, nor should it be taken into the jury room during deliberation. *See id.* The condition is simply that the defendant make a timely objection to the introduction of the transcript under section 76–3–207(4). *See id.* at 1001.

Such a construction of section 76–3–207(4) is supported by our own case law, as well as the Utah Rules of Criminal Procedure. In *State v. Solomon,* 96 Utah 500, 87 P.2d 807, 811 (1939), we held that "such testimony [given at a former hearing and used for

impeachment], even though taken by a reporter, transcribed, and certified, is not documentary evidence to be received in writing and given to the jury." The court further observed that "the common law always excluded depositions and written testimony from being carried away from the bar by the jury." *Id.* 87 P.2d at 811. The *Solomon* court's rationale is sound: If some evidence is admitted in oral form only, while other evidence is first read and then delivered to the jury in writing, "it is obvious that the side sustained by written evidence is given an undue advantage." *Id.*

A more recent decision, *State v. Davis,* 689 P.2d 5 (Utah 1984), also applies. Citing *Solomon* with approval, that case held that the trial court erred by allowing the jury to take a partial deposition into the jury room for deliberation. *Id.* at 14–15. However, the court never reached the question of whether the error was prejudicial or harmless because the defendant failed to make a proper and seasonable objection. *Id.* at 15.

Finally, our reading of section 76-3-207(4) also comports with rule 17(k) of the Utah Rules of Criminal Procedure. Rule 17(k) states, "Upon retiring for deliberation, the jury may take with them the instructions of the court and all exhibits and papers which have been received as evidence, *except depositions....*" Utah R.Crim.P. 17(k) (emphasis added). While not directly on point, rule 17(k) indicates that exhibits which are testimonial in nature should not be given to the jury during its deliberations.

In sum, we hold that, subject to timely objection, section 76-3-207(4) is governed by the constitutional safeguards established in *Roberts* and adopted by this court in *Brooks.* We further hold that "the transcript of all [prior] testimony" contemplated by section 76-3-207(4) is admissible in oral form only and must not be introduced into evidence as an exhibit or given to the jury to use during deliberation.

■ Today's construction of section 76-3-207(4) renders moot Carter's arguments that the provision is facially unconstitutional. We now turn to his allegations that the statute was unconstitutionally applied to his particular case.

Carter claims that the trial court erred by (1) permitting the State to introduce the Abstract into evidence as an exhibit to be taken into the jury room; (2) allowing the State to read only inculpatory excerpts of the Tovars' 1985 testimony, leaving out most of the cross-examination; (3) admitting the prior testimony of individuals who did not testify at the 1992 penalty hearing but were available to do so; (4) admitting the prior testimony of individuals who also testified at the 1992 penalty hearing; and (5) admitting the transcript of the Tovars' 1985 testimony even though the State did not make a good faith showing that they were unavailable at the 1992 penalty hearing. We reject all of these claims of error.

Carter asserts that he was unfairly burdened by the trial court's decision to admit the Abstract into evidence as an exhibit to be taken into the jury room. Not only did he have to disprove the credibility of the testimony contained in the Abstract, complains Carter, but he was also forced to counteract the undue emphasis given that testimony because of the double exposure resulting from the Abstract's presence in the jury room.

As today's construction of section 76-3-207(4) makes clear, we agree with Carter that admitting the Abstract into evidence as an exhibit and permitting it to be taken into the jury room was error. We now hold that prior testimony introduced under section 76-3-207(4) is admissible in oral form only and may not be taken into the jury room. However, under the particular facts of this case, we do not find the error harmful or prejudicial under the beyond-a-reasonable-doubt standard. *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *State v. Hackford,* 737 P.2d 200, 204 (Utah 1987).

It is true that some portions of the Abstract, particularly the Tovars' testimony, constituted the sole source of certain inculpatory evidence. In this case, however, we do not believe the impact of that evidence was unduly magnified by letting the jurors later read what they had already heard. The inculpatory testimony contained in the Ab-

stract undoubtedly had a dramatic impact simply from being read into the record. Moreover, we note that taking the Abstract into the jury room provided the jurors with their only opportunity to read and consider those portions not previously read into the record by the State, an omission complained of by Carter. Thus, although the trial court erred, its ruling provided the jury with complete access to Carter's original counsel's full cross-examination and any other evidence in mitigation contained in the Abstract.

In *Hackford*, we said that whether an error under the beyond-a-reasonable-doubt standard is harmless depends on numerous factors, including

> "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*Hackford*, 737 P.2d at 205 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)). Our consideration of these factors and the total state of the evidence in Carter's hearing convinces us that no harm resulted from the use of the Abstract.

■ With respect to Carter's second claim, we find no error in the trial court's decision to allow the State to read only selected excerpts of the Abstract into evidence. While we hold today that the entire transcript of prior testimony might be read into evidence under section 76–3–207(4)—subject, of course, to the Confrontation Clause principles discussed above—we leave it to the parties to determine which portions, if any, they choose to read. We think this approach serves the interests of both parties because it helps make a resentencing hearing more like an original penalty hearing. In other words, the parties will have some discretion as to

what prior information they want the resentencing authority to receive. Moreover, this course affords both sides an effective check should one party decide to read only the most inculpatory or exculpatory evidence. In any event, we think it likely, and advisable, that the parties will enter into a prehearing stipulation as to what will and will not be read.

■ Carter's final claim of error breaks down into three subcategories. He argues that the trial court erred by admitting the Abstract into evidence because it contained the testimony of (1) witnesses who did not testify at the 1992 penalty hearing and were not shown to be unavailable, (2) witnesses who testified in person at the 1992 penalty hearing, and (3) Epifanio and Lucia Tovar, despite the State's insufficient showing of unavailability.

The first two subcategories are easily dismissed. While it was error for the trial court to admit the Abstract testimonies without a showing of unavailability, we find the error to be harmless. Aside from the Tovars' testimony, the witnesses in the first category provided relatively uncontroversial material, such as the findings of the Utah State Crime Laboratory, an eyewitness identification of Carter in Wendover, Nevada, and general foundational evidence.

We also find no error in the trial court's decision to permit certain other witnesses to testify in person at the 1992 penalty hearing despite the fact that the Abstract contained their 1985 testimony. This category included Orla Oleson, Detective Brad Leatham, Dr. Sharon Schnittker, and Lieutenant George Pierpont.[17] To begin, Carter admits that all four witnesses gave basically the same testimony in 1992 as they gave in 1985. While that testimony was undoubtedly somewhat duplicative, we think that any harm done was outweighed by the benefit afforded Carter, who had the opportunity to confront and cross-examine the four witnesses.

---

**17.** Orla Oleson described his movements on the night of the murder and his discovery of the body. Detective Leatham testified to the condition and location of the body and other physical evidence. Dr. Schnittker presented her medical findings regarding the condition of the body and the cause of death. Lieutenant Pierpont described the circumstances of Carter's apprehension and the substance of his confession.

■ The third part of Carter's claim is directed at the trial court's determination that the Tovars were unavailable to testify at the 1992 penalty hearing. Their testimony was important because they were the State's key witnesses. For example, the Tovars' testimony corroborated Carter's confession by placing him in the Oleson's home on the night of the murder and provided persuasive evidence that he committed the homicide.[18]

At the 1992 penalty hearing, the State called Lieutenant George Pierpont to the stand in an effort to demonstrate the Tovars' unavailability under rule 804 of the Utah Rules of Evidence. Lieutenant Pierpont testified that he had attempted to locate the Tovars "from time to time over the last few years." His latest attempt occurred the previous day when he contacted the United States Marshall's Office. Apparently, Pierpont knew that the United States Marshall had a warrant for Epifanio Tovar's arrest and thought that the federal authorities might have some information as to the Tovars' whereabouts. His efforts were, however, unsuccessful. The federal authorities still had a warrant out for Mr. Tovar's arrest but could not provide any concrete information as to his present location, other than that he might be found in Mexico or southern California. Pierpont further testified that he was unable to locate Perla Lacayo, a friend of the Tovars who gave a statement to police in the 1985 investigation.

Carter contended that the dispute was not merely evidentiary, as the State assumed, but also implicated his right to confrontation. Having anticipated a dispute over the Tovars' unavailability, Carter proffered evidence of the efforts made by his private investigator to locate the Tovars. According to Carter, the investigator learned that (1) Beehive Bail Bonds had bailed Epifanio Tovar out of jail and then lost its $50,000 when Tovar skipped bail; (2) the Tovars had repeatedly travelled back and forth between Utah and California over the last several years; (3) the Tovars might be located in Riverside or East Los Angeles, California, where they had relatives; and (4) the Tovars were seen in Riverside, California, in late November 1991. Based on this information, Carter argued that the Tovars could be located with assistance from law enforcement agencies and were not unavailable for Confrontation Clause purposes.

After considering the parties' arguments, the trial court determined that the State's efforts were satisfactory:

It appears to the Court that there has been a reasonable effort made in this case, if, in fact, now with the additional information [secured by the defense], if these people can be located, if you take steps under the uniform act to attempt to procure their attendance.

But it . . . does appear to this Court that there has been adequate effort, from both sides, it would [appear that if] those people are subject to being located, that this effort has been made, substantially.[19]

18. Basically, the Tovars described two conversations with Carter, one just prior to and one immediately following Eva Oleson's murder. The Tovars testified that in these conversations, Carter made highly damaging and incriminating admissions. Epifanio Tovar claimed that Carter left the Tovar home on the night of the murder saying that he "was going to go rape, break and drive." Mr. Tovar recounted that when Carter returned, he told the Tovars that he had killed a woman by stabbing her with a knife about eleven times and then shooting her in the head. Mr. Tovar also related that Carter said he had put a pillow over the muzzle of the murder weapon to muffle the sound of the gunshot and that Carter physically demonstrated how he committed the homicide and encouraged the Tovars to "watch the news" for information on the murder. Finally, Mr. Tovar described how Carter hid the probable murder weapon in a portable whirlpool and eventually asked Tovar to dispose of it. Mr.

Tovar admitted to throwing the gun into the Spanish Fork River.

Lucia Tovar corroborated her husband's testimony, describing how Carter got down on the floor with his hands behind his back and made stabbing motions in the air with a closed fist to illustrate the murder. Mrs. Tovar also testified that Carter "laughed and laughed" about the murder.

19. While we acknowledge that the trial court's statement may indicate that it impermissibly considered Carter's efforts when determining whether the State had met its unavailability burden, we think that an alternate reading is more likely. We believe that the trial court meant that both Carter and the State had made adequate independent efforts to locate the Tovars. In any event, the court was correct in the pragmatic sense that the Tovars still had not been found despite all the efforts made.

Although the trial court did not expressly state whether it had made a rule 804 or a Confrontation Clause determination, we believe that given the substance of the parties' arguments, the trial court's ruling addressed both legal standards.[20]

As we have explained, section 76–3–207(4) must be read to comport with the right-of-confrontation safeguards recognized by Utah and federal law. Again, the party proffering the testimony must (1) show that the witness is unavailable, and (2) demonstrate that the unavailable witness's prior testimony bears sufficient indicia of reliability to permit its introduction at the later proceeding. *Brooks*, 638 P.2d at 539. We review a trial court's determination under this test using an abuse-of-discretion standard. *State v. Chapman*, 655 P.2d 1119, 1122 (Utah 1982); *Gallegos v. Turner*, 526 P.2d 1128, 1129–30 (Utah 1974).

A witness is unavailable under Utah law if a good faith effort was made to secure the witness's presence at trial. *State v. Oniskor*, 510 P.2d 929, 931 (Utah), *cert. denied*, 414 U.S. 861, 94 S.Ct. 78, 38 L.Ed.2d 112 (1973). We recently characterized the unavailability requirement as "stringent" and held that "in order for a witness to be constitutionally unavailable, it must be practically impossible to produce the witness in court." *Webb*, 779 P.2d at 1112–13.

While the State's efforts to locate the Tovars cannot be described as exhaustive,[21] we find the trial court's determination to be within the limits of its discretion. In reaching this conclusion, we are persuaded by the outstanding federal warrant for Epifanio Tovar's arrest. The State had not merely lost track of the Tovars due to passage of time or perhaps relocation. Nor is this a case like *Chapman*, where the witness's location was known but the State simply failed to make a good faith effort to secure their attendance at trial. 655 P.2d at 1123. Epifanio Tovar is an illegal alien wanted on federal drug charges. There is every likelihood that he

and his wife are actively avoiding both state and federal authorities. Thus, the State's task was not simply to subpoena an out-of-state witness but to track down a fugitive from the law.

Given the Tovars' fugitive status, we agree that it was practically impossible for the State to produce them in court. *See Webb*, 779 P.2d at 1112–13. If the United States Marshal's Office, with all of its resources, could not locate the Tovars over a period of several years, we think it reasonable for the trial court to conclude that they were unavailable to testify at the 1992 penalty hearing. The State made a good faith effort to secure their presence at trial, and "[a]lthough in retrospect other efforts might have been made, the [trial court's] determination does not appear to us to be an abuse of discretion." *Brooks*, 638 P.2d at 540.

Having determined that the Tovars were unavailable, we now turn to the second part of the *Brooks* Confrontation Clause test: Did the Tovars' 1985 testimony bear sufficient indicia of reliability to permit its admission at the 1992 penalty hearing? We answer in the affirmative.

Carter admits that preliminary hearing testimony meets the reliability standard for purposes of introducing that testimony at the guilt phase of a trial, *see Brooks*, 638 P.2d at 540, but he contends that the same is not true for guilt phase testimony and sentencing proceedings. He bases his argument on the distinction that both the preliminary hearing and the guilt phase of a trial deal with guilt and innocence, while the sentencing phase is concerned with imposing the proper penalty by weighing aggravating and mitigating factors. Because the purposes or motives of the guilt and penalty phases differ, continues Carter, his 1985 cross-examination of the Tovars did not provide an adequate opportunity to question or cross-examine on issues appropriate to sentencing. Therefore, the Tovars' 1985 trial testimony did not bear sufficient

---

20. We note that the determination should have been limited to the Confrontation Clause issue because the Utah Rules of Evidence do not apply to sentencing proceedings. *See* Utah R.Evid. 1101(b)(3).

21. The Tovars' status as illegal aliens may have precluded the State from pursuing normal investigative avenues, such as tracing a driver's license or a social security card.

indicia of reliability to permit its introduction at the 1992 penalty hearing.

We disagree. A defendant in fact enjoys greater procedural rights at the guilt phase of a capital trial than at sentencing [22] and essentially has the same interests at stake.[23] Thus, we hold that sworn testimony offered during the guilt phase of a capital trial by its very nature bears indicia of reliability which are usually sufficient to assure adequate protection of a defendant's right of confrontation. *Cf. id.* (preliminary hearing testimony usually bears sufficient indicia of reliability to safeguard right of confrontation).

■ The Confrontation Clause guarantees only an opportunity for effective cross-examination; it does not guarantee cross-examination that is as effective as the defense might wish. *State v. Seale*, 853 P.2d 862, 873 (Utah) (citing *United States v. Owens*, 484 U.S. 554, 559, 108 S.Ct. 838, 843, 98 L.Ed.2d 951 (1988)), *cert. denied,* — U.S. —, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993). Our review of the record reveals that Carter had and took advantage of the opportunity to cross-examine the Tovars in 1985.[24] Therefore, we need not reach the issue of whether Carter's original counsel cross-examined effectively or whether his present counsel might have asked different questions.

We hold that the trial court did not abuse its discretion by permitting a transcript of the Tovars' 1985 testimony to be admitted into evidence at the 1992 penalty hearing. The Tovars were unavailable, and their prior testimony possessed sufficient indicia of reliability to warrant its admission. In sum, the right of confrontation guaranteed Carter by

the Utah and United States Constitutions was not violated.

■ We acknowledge and dismiss Carter's argument that capital defendants, as a class, are denied equal protection of the law because, unlike other criminal prosecutions, the death penalty scheme does not employ the Utah Rules of Evidence. "[W]hen classifications are created, the pertinent inquiry for purposes of equal protection is whether some reasonable nexus exists between the classification implicated and a valid governmental objective." *State v. Bell*, 785 P.2d 390, 398 (Utah 1989) (plurality opinion). If applied in accord with today's decision, we find a reasonable nexus between section 76–3–207(4)'s evidentiary standard and the valid governmental purpose of balancing the State's interest in effectuating lawfully imposed death sentences against the defendant's interest in ensuring that his or her constitutional rights are respected.

Contrary to Carter's position, section 76–3–207(4)'s "lax evidentiary standards" serve the interests of both the State and the defendant. While it is true that the State may introduce evidence in aggravation under section 76–3–207(4) that might well be excluded under the Utah Rules of Evidence, so may Carter introduce evidence in mitigation that might also be excluded under the rules. Moreover, Carter ignores the fact that section 76–3–207(4) exists precisely because death penalty cases must be appealed. As in the instant case, it may be years before that appeal procedure has run its course. Thus, section 76–3–207(4)'s evidentiary scheme also has the legitimate purpose of preserving a record of information so that later sentencing authorities might better perform their duties.

---

22. For example, the 1985 guilt phase was governed by the strict standards of the Utah Rules of Evidence, while the 1992 penalty hearing was controlled by the lower evidentiary standards of section 76–3–207.

23. At the guilt phase of the 1985 trial, Carter attempted to establish a reasonable doubt as to his guilt by cross-examining and discrediting the State's witnesses. Although some of Carter's 1985 questions were inartful, much of the evidence adduced by his cross-examination of the Tovars was also relevant as evidence in mitigation at the 1992 penalty hearing.

24. Indeed, Carter's cross-examination established or raised inferences that Epifanio Tovar (1) lied to the police during the murder investigation, (2) regularly used marijuana, (3) may have falsely implicated Carter to solve his own legal difficulties, (4) delayed reporting his information to police, and (5) had been "coached" by the State before trial. With respect to Lucia Tovar, Carter's cross-examination established or raised inferences that (1) she had a poor command of the English language and may have misunderstood Carter's statements; and (2) Carter's laughter may have been directed at a television show rather than at the murder.

Carter next attacks the constitutionality of section 76–3–207's enactment by the Utah Legislature. His challenge rests on two assumptions: (1) Section 76–3–207 violates article VIII, section 4 of the Utah Constitution [25] because it was passed with less than a two-thirds majority vote; and (2) the Utah Supreme Court attempted to redress this problem in *In re Rules of Procedure and Evidence to be Used in the Courts of this State,* 18 Utah Adv.Rep. 3 (Sept. 10, 1985) (per curiam), when the court adopted, pursuant to article VIII, section 4, "all existing statutory rules of procedure and evidence not inconsistent with or superseded by rules of procedure and evidence heretofore adopted by this Court."

Based on these preliminary assumptions, Carter makes two alternative arguments. First, he claims that section 76–3–207 is unconstitutional because it was enacted in violation of the two-thirds majority requirement of article VIII, section 4. Thus, he asserts that the Utah Supreme Court could not lawfully adopt section 76–3–207 because of its constitutionally deficient enactment. Second, Carter argues that the Utah Supreme Court could not lawfully adopt section 76–3–207 because subsections (2) [26] and (4) [27] directly conflicted with "heretofore adopted" rule 804(b)(1) [28] of the Utah Rules of Evidence.

■ Carter's arguments fail for two reasons. First, the legislature enacted section 76–3–207 in 1973, twelve years before article VIII, section 4 was added to the Utah Constitution. Unless expressly stated otherwise, constitutional amendments are to operate prospectively only. *Mercur Gold Milling & Mining Co. v. Spry,* 16 Utah 222, 229, 52 P.

382 (1898). The legislature made no express retroactivity statement with respect to article VIII, section 4. Second, subsections 76–3–207(2) and (4) cannot possibly conflict with rule 804(b)(1) because the Utah Rules of Evidence do not apply to sentencing proceedings. *See* Utah R.Evid. 1101(b)(3).[29]

Finally, Carter makes several arguments directed toward Utah's capital punishment scheme in general, claiming that the statute is constitutionally deficient because it is more stringent and/or provides less due process than do statutes in other jurisdictions. These arguments are without merit, and we reject them without further discussion.

### B. Use of the "Heinous" Nature of the Crime as an Aggravating Circumstance at Sentencing

■ Carter argues that the trial court committed reversible error in permitting the 1992 penalty jury to consider the allegedly heinous nature of the murder as an aggravating circumstance in determining his sentence. Section 76–5–202(1)(q) of the Utah Code defines the heinous murder aggravating circumstance as follows: "The homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." Utah Code Ann. § 76–5–202(1)(q) (1990). Pursuant to the State's request, the trial court instructed the 1992 penalty jury in accordance with section 76–5–202(1)(q). Carter contends that because *Carter I* reversed his conviction under section 76–5–202(1)(q) due to faulty jury instructions and, impliedly,

---

**25.** That provision states in relevant part:
 The Supreme Court shall adopt rules of procedure and evidence to be used in the courts of the state and shall by rule manage the appellate process. The Legislature may amend the Rules of Procedure and Evidence adopted by the Supreme Court upon a vote of two-thirds of all members of both houses of the Legislature.
Utah Const. art. VIII, § 4.

**26.** Utah Code Ann. § 76–3–207(2) (1990) states in relevant part, "Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence."

**27.** Utah Code Ann. § 76–3–207(4) (1990) states in relevant part, "In cases of remand for new sentencing proceedings, all exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing proceedings shall be admissible in the new sentencing proceedings...."

**28.** Rule 804(b)(1) contains the former hearsay testimony exception.

**29.** Also, we note that today's decision renders moot Carter's argument under section 76–3–207(4).

insufficiency of evidence, the 1992 penalty jury could not lawfully consider that aggravating circumstance. We are unpersuaded.

*State v. Young,* 853 P.2d 327, 352 (Utah 1993) (4–1 decision on this issue), supports the conclusion that no error occurred here. In *Young,* the defendant claimed that the trial court erred by permitting the State to present an aggravating circumstance—section 76–5–202(1)(q)—at the penalty phase despite the fact that it had not been considered during the guilt phase. *Id.* In response to Young's claim, we held: "Nothing in the Utah death penalty statutes requires that the State present all statutorily defined aggravating circumstances during the guilt phase.... Therefore, the jury may properly consider these [aggravating] factors in the penalty phase even when the factors were not introduced during the guilt phase of the trial." *Id.*

We acknowledge that Carter's case is distinguishable on the grounds that the State presented the disputed aggravating factor at the guilt phase and we reversed on appeal. However, our holding in *Carter I* turned on faulty language in the section 76–5–202(1)(q) jury instruction, not on the issue of whether the State presented sufficient evidence to warrant the giving of the instruction.[30] Thus, *Young* authorizes the trial court's decision to give the section 76–5–202(1)(q) instruction.

### C. Juror Challenges

Carter claims that the 1992 penalty court abused its discretion by refusing to remove three prospective jurors for cause.[31] According to Carter, the trial court's refusal forced him to waste three peremptory challenges and amounted to reversible error. Carter also notes that he exhausted his supply of peremptory challenges.

**30.** For this reason, Carter's reliance on *State v. Tuttle,* 780 P.2d 1203 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990), is misplaced. In *Tuttle,* we reduced a capital murder conviction to second degree murder because we found that the evidence did not warrant a conviction of heinous murder under section 76–5–202(1)(q). *Id.* at 1215–19.

In *State v. Menzies,* 235 Utah Adv.Rep. 23, —— P.2d —— (Utah 1994), we overruled a line of cases stemming from *Crawford v. Manning,* 542 P.2d 1091 (Utah 1975). Under *Crawford* and its progeny, reversal was required whenever a party was compelled "to exercise a peremptory challenge to remove a panel member who should have been stricken for cause." *State v. Bishop,* 753 P.2d 439, 451 (Utah 1988); *see also Crawford,* 542 P.2d at 1093. In *Menzies,* we abandoned this mechanical reversal requirement and adopted the majority rule, upheld by the United States Supreme Court, that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the [Constitution] was violated." *Menzies,* 235 Utah Adv.Rep. at 24, —— P.2d at ——. Under the new rule, to obtain reversal "a defendant must demonstrate prejudice, *viz.,* show that a member of the jury was partial or incompetent." *Id.*

Carter has neither asserted nor shown that he faced a partial or biased jury during the second penalty phase of his trial. Because he has failed to show that any member of the jury was partial or incompetent, we conclude that even if the trial court erred in failing to remove those prospective jurors whom Carter found objectionable, that error was harmless. *See* Utah R.Crim.P. 30(a).

Nevertheless, we take this opportunity to address an issue of growing concern to this court. We are perplexed by the trial courts' frequent insistence on passing jurors for cause in death penalty cases when legitimate concerns about their suitability have been raised during voir dire. While the abuse-of-discretion standard of review affords trial courts wide latitude in making their for-cause determinations, we are troubled by their tendency to "push the edge of the envelope," especially when capital voir dire panels are

Further, we note that Carter was also convicted under section 76–5–202(1)(d) of aggravated burglary. Thus, he remained death-qualified under section 76–5–202 regardless of the similarities, or lack thereof, to *Tuttle.*

**31.** The three prospective jurors at issue are Alan Manwaring, Connie Lynne Fausett, and Nancy Zabel.

so large and the death penalty is at issue. Moreover, capital cases are extremely costly, in terms of both time and money. Passing questionable jurors increases the drain on the state's resources and jeopardizes an otherwise valid conviction and/or sentence.

■ Pursuant to our inherent supervisory powers, we strongly advise trial courts to be more conservative in the future when making for-cause determinations in capital cases.[32] If a party raises legitimate questions as to a potential juror's beliefs, biases, or physical ability to serve, the potential juror should be struck for cause, even where it would not be legally erroneous to refuse. We emphasize that today's exercise of our supervisory power applies to the guilt and sentencing phases of death penalty cases only.

### D. Admission of Victim Impact Evidence

■ Carter argues that the trial court erred when it overruled his objection and permitted the State to introduce victim impact evidence through the live testimony of Orla Oleson. Specifically, Carter complains that Mr. Oleson was impermissibly allowed to describe his wife as "a very, very particular housekeeper, very good mother, and a very hard working, graceful wife." Carter also challenges statements referring to Eva Oleson's compassion and her care for a neighbor who was dying of cancer. Finally, Carter objects to Mr. Oleson's discussion regarding the effects of his wife's death on their family. Carter takes particular exception to the following statement:

Well, up to that point Kim [the Oleson's teen-aged son] had been a very good student in school, a young man with a very nice circle of friends. When no immediate suspect was found in this crime, I of course immediately became the prime suspect. There were a lot of snickering and talking among young people. And I think that had a severe impact on his, on his life and his attitude, his friends' attitude. And his life's just seemed to turn around right at that point and, actually, he never really recovered since.

On appeal, Carter relies on *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and rule 403 of the Utah Rules of Evidence[33] in an attempt to demonstrate that the probative value of the State's victim impact evidence was outweighed by the danger of unfair prejudice to him.[34] He asserts in his brief that the victim impact evidence admitted at the 1992 penalty hearing was fundamentally different (and more prejudicial) than that allowed by the Supreme Court in *Payne:*

[Unlike the evidence admitted in this case, t]he victim impact testimony [in *Payne* ] did not deal with the laudatory personal characteristics of the deceased, nor did it go into the traumatic effect of the murders on other surviving family members.

. . . .

[The victim impact testimony in this case] went far beyond the victim impact testimony in *Payne*, because rather than simply dealing with the impact upon the victim, it

---

32. We have long recognized our inherent power to supervise the courts of this state. *See, e.g., State v. Thurman*, 846 P.2d 1256, 1266 (Utah 1993) (using inherent supervisory power to establish appropriate standard of review); *State v. Lafferty*, 749 P.2d 1239, 1260 (Utah 1988) (using inherent supervisory powers to add evidentiary requirements to penalty phase of capital trials), *habeas corpus granted on other grounds, Lafferty v. Cook*, 949 F.2d 1546 (10th Cir.1992); *Smith v. Smith*, 726 P.2d 423, 425–26 (Utah 1986) (imposing requirement of detailed findings and reasons for decree awarding custody); *State v. Long*, 721 P.2d 483, 492–93 (Utah 1986) (imposing requirements regarding cautionary eyewitness instructions); *In re Clatterbuck*, 700 P.2d 1076, 1081 (Utah 1985) (imposing requirement of detailed findings and reasons for certifying juveniles to stand trial as adults).

33. Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

34. Although this court cited *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), in *State v. Young, 853 P.2d 327, 353 (Utah 1993), we have yet to determine whether victim impact evidence is admissible under the Utah Constitution. Like Carter, the *Young* petitioner challenged the admission of victim impact evidence only under the United States Constitution. Id.*

described the personal characteristics of the victim and the emotional impact of her death upon other family members.

Carter not only mischaracterizes the nature of the victim impact evidence at issue in *Payne*,[35] but also fails to cite the acceptable evidentiary parameters established by that decision. The *Payne* Court expressly stated that it granted certiorari to determine whether "the Eighth Amendment prohibits a capital sentencing jury from considering 'victim impact' evidence relating to the personal characteristics of the victim and the emotional impact of the crime on the victim's family." 501 U.S. at 817, 111 S.Ct. at 2604.

After reviewing the relevant authorities and policy considerations, the *Payne* Court concluded that the Eighth Amendment does not prohibit such evidence. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. at 2609. Further, Justice O'Connor's concurrence states that a capital jury might hear evidence on "the full extent of the harm caused by the crime, including its impact on the victim's family and community. A State may decide also that the jury should see 'a quick glimpse of the life petitioner chose to extinguish,'...." *Id.* at 830, 111 S.Ct. at 2611 (O'Connor, J., concurring) (citation omitted).

Although not factually identical to the victim impact evidence at issue in *Payne*, the victim impact evidence in the instant case falls well within the federal constitutional standards contemplated by the *Payne* Court. The statements challenged by Carter clearly refer to "the personal characteristics of the victim and the emotional impact of the crime on the victim's family." For example, Eva

Oleson was described as a "particular housekeeper" and a "good mother." These are undeniably personal characteristics. And Mr. Oleson's statements regarding the effect of the murder on his son unquestionably falls into the category of emotional impact of the crime on the victim's family.

■ Having decided that the victim impact evidence admitted by the trial court falls within the parameters contemplated by *Payne*, we now turn to Carter's rule 403 argument. As previously noted, the Utah Rules of Evidence, by their own terms, do not apply to sentencing proceedings. *See* Utah R.Evid. 1101(b)(3). Thus, Carter's reliance on rule 403 is misplaced. Instead, the proper evidentiary standards are found within subsection 76–3–207(2) of the Utah Code. That subsection states in pertinent part:

> In these sentencing proceedings, evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence.

Utah Code Ann. § 76–3–207(2). Thus, the question before the court is whether victim impact evidence is admissible under the standards established by section 76–3–207(2). This is a question of first impression.

Section 76–3–207(2) contains two admissibility requirements: The evidence must (1) be relevant to the sentence and (2) have probative force. We hold that victim impact evidence fails both statutory requirements and is inadmissible under section 76–3–207(2) of the Utah Code.[36]

---

**35.** While *Payne*'s victim impact evidence did not address the laudatory characteristics of the victim, it certainly did describe the impact of the double murder on family members, particularly the infant son. For example, the boy's grandmother testified: "He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie." 501 U.S. at 814, 111 S.Ct. at 2603. In closing arguments, the prosecution reminded jurors that

"[petitioner's attorney] doesn't want you to think about the people who love Charisse Christopher, her mother and her daddy who loved her. The people who loved little Lacie Jo, the grandparents who are still here." *Id.*

**36.** In *Lafferty*, we explained that "Utah's death penalty statute provides for a penalty phase in which evidence of any relevant aggravating or mitigating circumstances may be admitted...."

While reiterating that the Utah Rules of Evidence have no binding force in capital sentencing proceedings, we turn to rule 401 for guidance. " 'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R.Evid. 401. In *State v. Johns*, 615 P.2d 1260, 1263 (Utah 1980), we explained that relevancy turns on "whether the proffered evidence would render the desired inference more probable [than] it would be without such evidence." In the context of a capital sentencing proceeding, the question is whether the State's proffer of victim impact evidence renders a defendant more culpable or deserving of the death penalty, that is, does victim impact evidence add to or subtract from a defendant's blameworthiness? We find that it has neither effect. *See, e.g., State v. Atwood*, 171 Ariz. 576, 655–57, 832 P.2d 593, 672–74 (1992) (en banc) (holding that victim impact evidence does not tend to establish aggravating circumstances enumerated by statute), *cert. denied*, ── U.S. ──, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993); *State v. Williams*, 113 N.J. 393, 550 A.2d 1172, 1203 (1988) (observing that evidence of victim's character and personality is only probative of certain aspects of trial such as assertion of self-defense or provocation).

The purpose of a capital sentencing proceeding is to determine whether a defendant will receive a sentence of death or life imprisonment. With respect to this sentencing function, "the primary goal in [a capital] sentencing phase is to acquire a thorough acquaintance with the character and history of the person before the court." *State v. Taylor*, 818 P.2d 1030, 1033 (Utah 1991), *cert. denied*, ── U.S. ──, 112 S.Ct. 1576, 118 L.Ed.2d 219 (1992). Permitting the State to introduce victim impact evidence shifts the focus of the proceeding from the defendant to the victim and the effect of the murder on the victim's family and community. This shift adds nothing to the culpability analysis and is fraught with danger. *See Williams*,

550 A.2d at 1202–03. Aside from causing the jury to lose sight of its immediate task, the shift suggests that some victims are more valuable to society and/or deserve more sympathy than others. Further, a judge or jury considering victim impact evidence is more likely to empathize with the family's tragedy, perhaps asking, "What if I, or a member of my family, were the murder victim?" Such empathy dangerously increases the possibility of improper passion or prejudice. *See Sermons v. State*, 262 Ga. 286, 417 S.E.2d 144, 146 (1992).

As for section 76–3–207(2)'s probativeness requirement, we find that victim impact evidence simply has no probative force in the sentencing context. Such evidence does not make it more or less likely that a defendant deserves the death penalty. · In our society, individuals are of equal value and must be treated that way. We will not tempt sentencing authorities to distinguish among victims—to find one person's death more or less deserving of retribution merely because he or she was held in higher or lower regard by family and peers. Such a scheme draws lines in our society that we think should not be drawn. The worth of a human life is inestimable, and we do not condemn those who take life more or less harshly because of the perceived value or quality of the life taken. *See Williams*, 550 A.2d at 1202. Indeed, society is probably incapable of even-handedness in such judgments.

Moreover, we note that such victim worth evidence is a "two-edged sword." *State v. Bernard*, 608 So.2d 966, 971 n. 7 (La.1992). If the State is allowed to introduce evidence of the victim's great value to society, the defense must arguably be permitted to rebut that showing with degrading evidence tending to demonstrate lack of worth. *Id.* The resultant "trial" on the *victim's* character provides no guidance as to the appropriate sentence for the defendant.

▆▆▆ Utah's capital sentencing scheme "imposes a number of restrictions and guidelines to channel the sentencing authority's

The only restriction on the admission of such evidence is that it must not be unfairly prejudicial to the accused." 749 P.2d at 1259 (citations omitted). We need not reach the question of prejudice because the threshold requirements—relevancy and probativeness—are not met.

exercise of discretion and to avoid capricious death penalties." *State v. Holland,* 777 P.2d 1019, 1025 (Utah 1989). We add another guideline today and hold that victim impact evidence is inadmissible under subsection 76–3–207(2) of the Utah Code.[37] This censure of victim impact evidence in capital cases applies to evidence of the victim's character, evidence of the effects of the crime on the surviving members of the family, and evidence of the surviving members' opinions of the crime. In reaching this conclusion, we acknowledge that the trial court in the instant case erred in overruling Carter's objection to the State's proffered victim impact evidence. However, error requires reversal only if prejudicial. "An error is prejudicial only if we conclude that absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant." *State v. Lafferty,* 749 P.2d 1239, 1255 (Utah 1988), *habeas corpus granted on other grounds, Lafferty v. Cook,* 949 F.2d 1546 (10th Cir. 1992). We conclude that the exclusion of the victim impact evidence at the 1992 penalty hearing would not have produced a more favorable outcome for Carter.

We reach this conclusion for two reasons. First, the nature of the victim impact testimony was relatively mild. Statements referring to Mrs. Oleson as "a very, very particular housekeeper, very good mother, and a very hard working, graceful wife" and to her son's difficulty in school following the murder fall short of being prejudicial or unduly inflammatory. Indeed, it is probable that the jurors' own imaginations contemplated the impact of the murder in broader scope than that articulated by the testimony in question. Second, given the weight of the aggravating evidence amassed against Carter, including the circumstances of the murder, his confession, and the Tovars' testimony, there is not a reasonable likelihood that exclusion of the victim impact evidence would have resulted in a sentence of life imprisonment. Therefore, we hold that the trial court's error was harmless.

### E. Evidence Relating to Rape

In the 1992 penalty hearing, the State introduced evidence related to Carter's alleged sexual assault or attempted sexual assault of Eva Oleson. The evidence was introduced primarily through the 1985 testimony of Epifanio Tovar and was submitted to the jury both in the form of a written transcript—the Abstract—and by being read into the record. The Abstract was also taken into the jury room during deliberation.

Carter challenges the admission of the following portions of Mr. Tovar's testimony:

> The State: What, if anything, did [Carter] tell you he was going to do when he left the first time?
>
> Mr. Tovar: He was going to rape, break and drive.
>
> . . . .
>
> The State: What, if any, questions did Mr. Tovar ask the defendant at that time with regard to whether or not Ms. Oleson had been raped?
>
> . . . .
>
> Mr. Tovar: (interpreter) If he had raped her.
>
> The State: What did [Carter] say?
>
> Mr. Tovar: (interpreter) That "I had not."
>
> The State: What, if any, reason did he give you as to why he had not raped her?
>
> Mr. Tovar: (interpreter) Because she was in her period.
>
> The State: What words exactly did he state?
>
> Mr. Tovar: (interpreter) "She was on the rag."

---

**37.** We note, however, that today's decision does not preclude the State from introducing evidence that is admissible for purposes other than demonstrating victim impact when that evidence also incidentally conveys that the defendant's crime has had victim impact consequences. *See Sermons v. State,* 262 Ga. 286, 417 S.E.2d 144, 146–47 (1992). Some facts about the victim, including those pertaining to his or her personal characteristics, may inevitably come out at trial, especially where such evidence is "probative of critical aspects of the trial—for example, the defendant's claim of self-defense or provocation." *Id.* 417 S.E.2d at 147; *State v. Williams,* 113 N.J. 393, 550 A.2d 1172, 1203 (1988). Such evidence remains admissible at the guilt phase of the trial and may be considered by the jury at the penalty phase.

Prior to its introduction, the trial court heard arguments regarding Carter's previously filed motion in limine to prevent the State from presenting sexual aspects of the evidence. Carter claimed that because the 1985 guilt phase jury had made no findings with regard to rape or attempted rape as an aggravating circumstance,[38] the 1992 trial court "must conclude that the jury was not convinced beyond a reasonable doubt that this homicide was committed during an attempt or a commission of rape or attempted rape." Thus, Carter concludes that allowing the State to introduce rape-related evidence at the 1992 penalty hearing subjected him to double jeopardy. The State counters that the evidence demonstrated Carter's poor character as well as his intent to torture his victim and commit an awful crime.

The trial court found the evidence admissible under section 76–3–207(2) and denied Carter's motion. The court stated that it would permit the State to read the testimony but "not for the purpose of showing that any rape was committed, nor that any attempt was made, nor do I want you to argue for that point, but only to demonstrate what the character and state of mind of the defendant may have been." The court further stated: "There isn't any evidence of [rape or attempted rape], I think the Jury can be told and should be indicated that there was no evidence of that. But it's purely the state of mind and the position and character of the defendant that is at issue." In accord with the trial court's statements, the parties stipulated before the jury that there was no objective or clinical evidence that a rape occurred.

On appeal, Carter again raises the same concerns with regard to the rape-related evidence. He asserts that the trial court's decision constituted prejudicial error because it allowed the State to retry Carter for rape or attempted rape in violation of the double jeopardy guarantees of the United States and Utah Constitutions. We disagree.

Because the trial court's decision to deny Carter's motion was based on its interpretation of section 76–3–207(2), the appropriate standard of review is correction of error. *State v. James*, 819 P.2d 781, 796 (Utah 1991). Accordingly, we grant no particular deference to the trial court's ruling. *State v. Deli*, 861 P.2d 431, 433 (Utah 1993).

Carter's double-jeopardy argument boils down to a complaint that the State introduced the same evidence which failed to establish rape or attempted rape in 1985 as evidence in aggravation at the 1992 penalty hearing. We fail to see how the Double Jeopardy Clause is implicated. The State did not seek to prove rape or attempted rape as an aggravating circumstance under section 76–5–202(2). Nor was the 1992 penalty jury given such an instruction. Indeed, the parties stipulated before the jury that there was no medical evidence indicating that a rape occurred.

Carter's complaint ignores the basic point that evidence may be relevant in several different contexts. For example, evidence relevant to a rape or attempted rape charge at a guilt phase hearing may also be relevant, under section 76–3–207(2), as evidence in aggravation or evidence demonstrating the nature and circumstances of the crime.

We find that the trial court correctly ruled that the rape-related evidence was admissible under section 76–3–207(2). "[A]ll aggravating evidence not unfairly prejudicial to the accused may be presented during the penalty phase of a capital proceeding." *State v. Young*, 853 P.2d 327, 352 (Utah 1993) (4–1 decision on this issue) (citing *State v. Lafferty*, 749 P.2d 1239, 1259 (Utah 1988), *habeas corpus granted on other grounds, Lafferty v. Cook*, 949 F.2d 1546 (10th Cir.1992)). Simply put, the 1992 penalty jury was entitled to know all the relevant facts and circumstances surrounding Eva Oleson's murder. The rape-related evidence was a part of those relevant facts and circumstances, and Carter was not unfairly prejudiced by its admission.

---

38. The 1985 jury was asked to determine whether Carter committed the homicide in connection with any of the following aggravating factors: (1) robbery, (2) aggravated burglary, (3) rape or attempted rape, (4) pecuniary gain, or (5) in a especially heinous, cruel, or exceptionally depraved fashion. Using a special verdict form, the jury checked the aggravated burglary and heinous murder boxes but left the others blank.

For example, the rape-related evidence is relevant to the nature and circumstances of the crime in that it demonstrates the type or degree of abuse suffered by Eva Oleson, as well as the type or nature of crime Carter may have intended to commit. Similarly, the evidence also tends to show Carter's poor character and depraved mental condition immediately prior to the murder.[39] Thus, we affirm the trial court's determination that the State's rape-related evidence was relevant and admissible under section 76-3-207(2).

### F. Aggravating Circumstances and Jury Unanimity

■ Carter next challenges the trial court's refusal to present the jury with his proffered supplemental instruction and special verdict form. The instruction required the jury to specially and unanimously find each aggravating factor relied on in imposing a death sentence. The special verdict form provided a mechanism for expressing its findings.

The trial court refused Carter's proffer on the ground that neither the instruction nor the special verdict form .was required or appropriate. Carter then preserved his right to appeal by specifically excepting to the trial court's decision.

On appeal, Carter asserts that the trial court's failure to provide the jury with his instruction and special verdict form prevented him from receiving a fair hearing in 1992. Relying on *State v. Wood*, 648 P.2d 71 (Utah 1982), and *State v. Lafferty*, 749 P.2d 1239 (Utah 1988), *habeas corpus granted on other grounds, Lafferty v. Cook*, 949 F.2d 1546 (10th Cir.1992), he asks that we remedy the situation by adopting a death sentencing scheme which would require the jury to unanimously and specially find, beyond a reasonable doubt, each aggravating factor upon which it relies in imposing its sentence.

■ Whether a trial court correctly refused to give a particular jury instruction is a question of law. Accordingly, we grant no particular deference to the trial court's ruling. *James*, 819 P.2d at 798 (citing *Ramon v. Farr*, 770 P.2d 131, 133 (Utah 1989)). As we stated in *James:*

> The purpose of giving instructions to the jurors is to assist them in understanding issues which they have to decide in the case. Included in a judge's duty to instruct the jury on the law applicable to the case is "the right of the defendant to have his theory of the case presented to the jury in a clear and understandable way." However, the trial court is not required to give any requested jury instruction if it does not comport with the facts or does not accurately state the applicable law.

819 P.2d at 798–99 (quoting *State v. Potter*, 627 P.2d 75, 78 (Utah 1981)). As a matter of law, we find that the trial court correctly refused Carter's proffered instruction and special verdict form because neither accurately stated the applicable law.

In essence, Carter argues that *Wood*[40] and *Lafferty*[41] have established a definite burden of proof and a clear analytic structure, thereby providing "objective standards to guide,

**39.** *See Young*, 853 P.2d at 353 (5–0 decision on this issue) (penalty jury may legitimately consider a defendant's character, future dangerousness, lack of remorse, and retribution).

**40.** In *Wood*, we held:
"After considering the totality of the aggravating and mitigating circumstances, [the sentencing authority] must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and [the sentencing authority] must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances."
648 P.2d at 83 (quoting *Wood*, 648 P.2d 71 (Utah 1981) (per curiam)).

**41.** In *Lafferty*, we held:

First, in jury cases, the sentencing jury must be instructed (i) as to the elements of the other crime regarding which the evidence was adduced and (ii) that it is not to consider evidence of that crime as an aggravating factor unless it first finds that the prosecution has proven all the elements of the crime beyond a reasonable doubt. Second, to assure that the sentencer's treatment of this aggravating factor can be distinguished on appeal from the treatment of other aggravating circumstances with respect to which no similar preliminary burden of proof rests on the prosecution, the sentencing body must specifically find whether the other crime was proven beyond a reasonable doubt.
749 P.2d at 1260.

regularize, and make rationally reviewable the process for imposing the sentence of death." However, Carter reasons that the *Wood–Lafferty* clarification is useless if a reviewing court is unable to determine whether the sentencer acted within the standards imposed by the cases, hence the need for a scheme requiring the jury to find specially and unanimously, beyond a reasonable doubt, each aggravating factor relied upon in imposing its sentence.

■ In *State v. Holland,* 777 P.2d 1019 (Utah 1989), we dealt with the issue of whether adequate appellate review required the sentencing authority to specify on the record the reasons relied upon in imposing the death sentence. *Id.* at 1025. After giving full consideration to the fundamental goals underlying any death penalty scheme— channelling the sentencing authority's exercise of discretion and avoiding the arbitrary and capricious imposition of the death penalty—we held that absent secret or withheld evidence,

> [g]iven the procedures required at trial and the careful appellate review given by this Court to death penalty cases over the years, a specification of reasons by the sentencing authority on the record for imposing the death penalty, even if it were practicable, is not necessary to prevent arbitrary and capricious sentences. Indeed, such a procedure would be extraordinarily cumbersome, especially when a jury would have to agree unanimously on a statement of reasons under the process outlined in *Wood.*

*Id.* (citation omitted). We reaffirm *Holland*'s holding and dismiss Carter's arguments. To avoid future confusion on the issue, we emphasize that *Holland* applies equally to death sentences imposed by judge or jury.

Carter erroneously cites *State v. Parsons,* 781 P.2d 1275 (Utah 1989) (plurality opinion), in support of his position. In that case, the State proffered, and the trial court gave, special verdict questions and instructions requiring the jury to specially and unanimously find each aggravating factor relied upon in imposing the death sentence. *Id.* at 1279. On appeal, we found no error in the instruc-

tion procedure. *Id.* at 1280. However, our decision in *Parsons* was greatly influenced by the fact that the defendant was not prejudiced by the procedure. Indeed, the special verdict form and instructions acted as an additional safeguard for the defendant. *Id.*

The crucial and distinguishing point, however, is that any additional safeguard enjoyed by the *Parsons* defendant was not required by Utah law. Thus, while *Parsons* tolerated the use of such special verdict forms and instructions under the particular facts of that case, absent withheld or secret evidence, "the law does not require the sentencing authority to set forth its specific reasons for imposing the death penalty." *Holland,* 777 P.2d at 1025.

■ We likewise find no merit in Carter's claim that he was denied equal protection of the law and proportional imposition of sentence because the *Parsons* defendant had the benefit of a special verdict form and instructions requiring jury specificity and unanimity. Carter's equal protection claim fails because he was afforded all statutory and judicial safeguards required by Utah law. The fact that the *Parsons* defendant enjoyed an additional, unrequired safeguard is irrelevant.

■ Carter's proportionality argument also fails. In essence, Carter asks us to address the proportionality of his sentence by comparing his conviction and sentence with that of the *Parsons* defendant. We have repeatedly rejected such requests, and we do so again today. *See State v. Archuleta,* 850 P.2d 1232, 1248–49 (Utah), *cert. denied,* ——— U.S. ———, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993); *State v. Gardner,* 789 P.2d 273, 286–87 (Utah 1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990); *Holland,* 777 P.2d at 1026; *State v. Tillman,* 750 P.2d 546, 562 (Utah 1987) (plurality opinion). As we stated in *Gardner:*

> Each defendant is an individual, and each case is unique in its facts. Any attempt to draw broad comparisons between defendants or crimes calls for speculation as to why a particular defendant or crime was dealt with by that jury in that particular fashion. The many factors which may in-

fluence a jury's decision cannot easily be identified, let alone quantified. 789 P.2d at 287. We are still persuaded by this reasoning. We reiterate that a case-by-case or a comparison proportionality review of a judge's or jury's decision to invoke the death penalty is not required under state or federal law. *Tillman*, 750 P.2d at 562. Thus, we find Carter's proportionality argument to be without merit and hold, as a matter of law, that under the facts of this case, the death penalty was legitimately imposed on him.

### G. Constitutionality of Utah's Capital Sentencing Statutes

By casting several of his earlier arguments in constitutional terms, Carter challenges the constitutionality of the Utah death penalty scheme under both the Utah and United States Constitutions. He asserts that Utah's death penalty scheme is unconstitutional because (1) the jury is given too much discretion and might impose the death penalty arbitrarily; (2) the jury is not required to find, unanimously and with specificity, the aggravating factors relied on in imposing the death penalty; (3) the capital sentencing statutes do not provide an effective means of case-by-case proportionality review; (4) as applied to Carter, the capital sentencing statutes permit a death penalty that is disproportionate to the crime committed and disproportionate to sentences in other Utah capital cases; and (5) the capital sentencing statutes violate the Double Jeopardy Clause because they permit a capital defendant to be twice subjected to the imposition of the death sentence.

With respect to Carter's first three claims, we note that these issues have been raised and disposed of contrary to Carter's position in previous cases. Specifically, the following issues have been addressed and rejected: (1) the unconstitutionality of Utah's death penalty scheme because it allows either too much discretion or unguided discretion in the imposition of the death penalty, *see Holland*, 777 P.2d at 1024; *Tillman*, 750 P.2d at 572; *Wood*, 648 P.2d at 81–83; *State v. Brown*, 607 P.2d 261, 268–71 (Utah 1980); *see also Andrews v. Shulsen*, 802 F.2d 1256, 1260–62

(10th Cir.1986), *aff'g Andrews v. Shulsen*, 600 F.Supp. 408 (D.Utah 1984), *cert. denied*, 485 U.S. 1015, 108 S.Ct. 1491, 99 L.Ed.2d 718 (1988); *Pierre v. Shulsen*, 802 F.2d 1282, 1282–83 & n. 2 (10th Cir.1986), *aff'g Shelby v. Shulsen*, 600 F.Supp. 432 (D.Utah 1984), *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987); (2) lack of appellate proportionality review, *see Holland*, 777 P.2d at 1025; *Tillman*, 750 P.2d at 561–62; *Wood*, 648 P.2d at 77; *State v. Pierre*, 572 P.2d 1338, 1345 (Utah 1977), *cert. denied*, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); and (3) failure to specify the aggravating circumstances found to warrant imposition of the death penalty, *see Holland*, 777 P.2d at 1025; *Andrews v. Shulsen*, 802 F.2d at 1261; *see also Brown*, 607 P.2d at 268; *Pierre*, 572 P.2d at 1348.

With respect to Carter's fourth and fifth challenges, we note that today's decision addresses and disposes of them. First, we reiterate that neither the federal nor the Utah Constitution requires case-by-case or comparison proportionality review. We also reiterate that, as a matter of law, under the *individual* crime-to-sentence proportionality review required by Utah law, the death penalty was legitimately imposed on Carter.

Second, "[t]he Double Jeopardy Clause affords three separate constitutional protections. Under the clause, either an acquittal or a conviction on a particular charge bars another prosecution on the same charge. The clause also bars multiple punishments for the same offense." *Holland*, 777 P.2d at 1023. The purpose of the 1992 penalty hearing was to determine whether Carter would receive a sentence of death or life imprisonment. His guilt had already been established. Carter was not being reprosecuted for the same charge, nor did he receive multiple punishments for the same offense. Again, we fail to see how the Double Jeopardy Clause is implicated and find the argument to be without merit.

We note that Carter's reliance on *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), is misplaced. In *Bullington*, the United States Supreme Court held that the penalty phase of a capital proceeding is essentially a trial on the issue of

punishment and that double jeopardy considerations apply. *Id.* at 446, 101 S.Ct. at 1862. Therefore, explained the Court, a jury's imposition of a life sentence in the first trial precluded the subsequent imposition of a death penalty following retrial. *See id.*

*Bullington* does not apply to Carter for two reasons. First, his conviction was not reversed and remanded for a new trial. Second, he received a sentence of death, not life imprisonment, following his first trial. Moreover, section 76–3–405 [42] prohibits imposition of a new sentence that is more severe than the prior sentence. *Dunn v. Cook,* 791 P.2d 873, 874 (Utah 1990). Thus, the concerns underlying *Bullington* are inapposite.

Nevertheless, Carter argues that the evidence submitted at the 1985 penalty hearing was insufficient as a matter of law to warrant the death penalty. Therefore, reasons Carter, *Bullington* is applicable because he should have been sentenced to life imprisonment in 1985. Without reaching the merits of Carter's rather dubious claim, we find that it has not been asserted in a timely fashion. The proper time to challenge the sufficiency of the evidence underlying his 1985 death sentence was on his first appeal. Utah R.Crim.P. 26(9).

## IV. CONCLUSION

Based on the foregoing analysis, defendant's conviction and sentence are affirmed.

ZIMMERMAN, C.J., and HOWE, J., concur.

STEWART, Associate Chief Justice, dissenting:

To convict a defendant of capital homicide, a jury must find that the defendant committed an intentional homicide under at least one of a number of aggravating circumstances. On the first appeal in this case, this Court held that the trial court erred in giving an instruction to the effect that the jury could convict defendant of capital homicide

under the aggravating factor stated in Utah Code Ann. § 76–5–202(1)(q) (Supp.1994), i.e., that "the homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." The Court in *Carter I* held that the instruction did not meet constitutional standards. Nevertheless, the Court affirmed the conviction on other grounds but vacated the sentence and remanded for a new penalty hearing.

On remand, the trial court instructed the jury in the penalty proceeding under the language of § 76–5–202(1)(q) to the effect that the jury could take into account the heinousness of the murder in deciding whether the penalty should be life or death. The Court now holds that an instruction based on the language of § 76–5–202(1)(q) may be given in the penalty phase, even though no court has addressed the issue of whether the facts of the case meet constitutional requirements for an instruction of that type to be given. I think that is indefensible.

On several occasions, we have recognized that all murders are "heinous, atrocious, cruel, or exceptionally depraved" as those terms are generally used. But the aggravating circumstances set out in the criminal code must serve to distinguish those intentional murders that qualify for capital punishment from those that do not. Simply put, not all intentional murders can give rise to a death sentence. An aggravating circumstance that describes all murders does not discriminate rationally between murders and therefore is unconstitutional. *Godfrey v. Georgia,* 446 U.S. 420, 431–33, 100 S.Ct. 1759, 1766–67, 64 L.Ed.2d 398 (1980); *State v. Wood,* 648 P.2d 71, 77 (Utah 1981), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Tuttle,* 780 P.2d 1203, 1217 (Utah 1989).

In my view, it is a circumvention and subversion of the spirit of the underlying principle in *Godfrey, Wood,* and *Tuttle* for a trial

---

**42.** Utah Code Ann. § 76–3–405 provides:

Where a conviction or a sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different

offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied.

court to instruct the jury in the penalty phase that it may consider the heinousness, atrociousness, and cruelty of the homicide as a factor justifying a death sentence instead of a life sentence when guilt was established on the basis of different aggravating circumstances.

In short, the jury is told that it may impose the death penalty on the basis of its understanding of the heinousness and cruelty language in § 76-5-202(1)(q) that will likely not meet the constitutional requirement.[1] That the instruction is given in the penalty phase does not make the error harmless. I recognize that *State v. Young,* 853 P.2d 327, 352 (Utah 1993), states the contrary, but I do not think that it is possible to square the ruling in *Young* with the rulings in *Godfrey, Wood,* and *Tuttle.*

In short, there was no reason for the trial judge to throw the weight of his position behind a prosecution argument in the penalty phase instructing the jury on the language of a statutory provision that was intended to serve an entirely different purpose.

I would vacate the sentence and remand for a new penalty hearing.

HALL, J., acted on this case prior to his retirement but did not participate in this amended opinion.

---

1. In 1990, the Legislature modified § 76-5-202(1)(q) to try to define the terms "heinous, atrocious, cruel, or exceptionally depraved" to meet the constitutional standard by adding the requirement that those factors "must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death." I think it doubtful that the language the Legislature added fully complies with the constitutional requirements set out in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Godfrey* made clear that "serious physical abuse" had to reflect "a consciousness materially more 'depraved' than that of [other persons] guilty of murder." *Id.* at 433, 100 S.Ct. at 1767. As this Court pointed out in *State v. Tuttle,* 780 P.2d 1203, 1216 (Utah 1989), defining the terms heinous, atrocious, and cruel was a matter of great difficulty. The Legislature's use of the terms "serious physical abuse" or "serious bodily injury of the victim before death" may raise significant issues as to whether they are sufficient to meet the constitutional standard.